[Civ. No. 5122. First Appellate District, Division One.—July 27, 1925.]

IRENE M. GIBBS, Appellant, v. H. S. HERSMAN et al., Respondents.

[1] CONTRACTS—SALE OF WINE GRAPES—MEANING OF TERM "SUITABLE FOR EASTERN SHIPMENT.—The term "suitable for Eastern shipment," used in written contracts for the purchase and sale of wine grapes, has a definite meaning in the grape-shipping industry, indicating a condition that will permit the fruit to be shipped to and arrive at eastern points in sound condition, allowing normal time for transportation.

[2] ID.—CANCELLATION OF CONTRACTS FOR SALE OF GRAPES—RIGHT OF BUYERS—CONSTRUCTION—EVIDENCE.—Buyers of grapes had the right, under the terms of written contracts for the sale thereof, to terminate said contracts, where said contracts called for a "fruit crop suitable for Eastern shipment" and "sound grapes, free from mildew, smut or rain damage," and, after enumerating certain specific causes for cancellation, provided that for any other reason beyond the buyers' control, directly or indirectly affecting the buyers' ability to perform the contract, the buyers may cancel the contracts, and further provided that until completion of delivery the "seller agrees to, and does assume all risks of loss,

depreciation or damage, of, whatsoever kind and nature, to any undelivered part of said crop," and the acceptance of deliveries was delayed by the existence of an embargo and strikes, and failure of transportation companies to provide cars, and the grapes became spoiled by rains and frost prior to completion of delivery and unfit for eastern shipment.

[3] ID.—DESTRUCTION OF SUBJECT MATTER—CANCELLATION.—Where, from the nature of the contract, it is evident that the parties contracted on the basis of the continued existence of the thing to which it relates, the subsequent perishing or destruction of the thing will excuse the performance; and, consequently, when the contract relates to any dealing with specific things, in which the performance necessarily depends on the existence of the particular things, the condition is implied by law that the impossibility arising from the destruction of the things, without fault in the party, shall excuse the performance, because, from the nature of the contract, it is apparent that the parties contracted on the basis of the continued existence of the subject of the contract.

[4] ID.—TITLE—CONSTRUCTION.—While the title to the grapes grown by the seller and suitable for eastern shipment was, by such written contracts, vested in the buyers at the time the contracts were signed, nevertheless, when the elements spoiled the undelivered portion of the crop so that the grapes became useless for the purpose for which the purchase and sale thereof was made, the loss fell upon the seller because said contracts provided that until completion of delivery the latter agreed to and did "assume all risks of loss, depreciation or damage, of whatsoever kind and nature, to any undelivered part of said crop."

[5] ID. — ACTION BY SELLER—DAMAGES FOR ALLEGED BREACH — CANCELLATION—FINDINGS—PLEADING.—In an action by the seller to recover damages on account of the alleged breach of such contracts by the buyers in refusing to accept the undelivered grapes, the trial court having found that the final refusal of the buyers to accept the balance of the crop was based upon the fact that the fruit was rendered unsuitable, on account of rain and frost, for eastern shipment, and that there existed a car shortage (which latter finding was important only for the purpose of showing that the buyers were justified in delaying deliveries of grapes and that those justifiable delays directly affected the ability of the buyers to perform their contracts up to the time the fruit was ruined by the elements for eastern shipment), the cancellation of said contracts, for the reasons found by the trial court, was authorized by the answer of the buyers, which alleged, after setting forth all of these facts and circumstances, that "Defendants further

---

3.   See 6 Cal. Jur. 443; 6 R. C. L. 1005.

aver, in that behalf, that on or about the said date, and by reason of said matters hereinbefore set forth, which directly affected their ability to perform said contracts, and each of them, the Defendants notified said Plaintiff that said contracts, and each of them, were and thereafter would be cancelled, pursuant to the terms of said contracts, and each of them."

[6] ID.—CANCELLATION—CONSTRUCTION.—In such action, not only pursuant to the cancellation section of such contracts, but also independently of it, the buyers (defendants) were entitled to terminate said contracts for the reason assigned by the trial court in its findings which was in effect that the subject matter of said contracts had been destroyed; and it is entirely immaterial whether such termination be construed as a "cancellation" of the contracts, or "an excuse for non-performance," for both remedies arise out of the same state of facts and are, to all intents and purposes, controlled by the same legal principles.

[7] ID.—TOTAL DESTRUCTION OF CROP—DELIVERY.—In such action, in order for the buyers to terminate such contracts, it was not necessary, as the plaintiff contends, that all of the fruit should have been first harvested, delivered and culled, for the reason that the crop was not partially but entirely spoiled.

[8] ID.—HARSHNESS OF CONTRACTS—ENFORCEMENT OF.—In such action, however harsh the contracts in question may be upon the seller in giving to the buyers absolute control of the delivery of the crop, the parties having voluntarily entered into such agreements, the provisions and purposes of which were admittedly legal, the defendants are entitled to have the terms thereof carried into effect.

[9] ID.—LETTERS—WAIVER—CANCELLATION.—In such action, a letter written by defendants to plaintiff notifying the latter to deliver the grapes, providing the same were undamaged, and in fit and proper condition for shipping as provided in the contracts, is unimportant, for the reason that the contracts, at the time such letter was written, had already been canceled, defendants having previously expressly refused to proceed with the sale, and plaintiff acting upon such refusal thereafter disposed of the grapes to other parties; and the question of waiver of the right to cancel the contracts upon the ground of car shortage conditions is also immaterial, because final refusal to take the crop was not placed on that ground.

(1) 4 C. J., p. 878, n. 82; 35 Cyc., p. 96, n. 98. (2) 35 Cyc., p. 344, n. 83. (3) 13 C. J., p. 643, n. 97; 35 Cyc., p. 246, n. 29, 30. (4) 35 Cyc., p. 303, n. 28. (5) 38 Cyc., p. 1970, n. 7. (6) 13 C. J., p. 525, n. 42, p. 527, n. 46; 35 Cyc., p. 128, n. 69, p. 139, n. 50. (7) 35 Cyc., p. 128, n. 69. (8) 35 Cyc., p. 128, n. 69. (9) 35 Cyc., p. 143, n. 88 New, p. 156, n. 70.

Appeal from a judgment of the Superior Court of Santa Clara County. P. F. Gosbey, Judge. Affirmed.

The facts are stated in the opinion of the court.

Bradley & Supple and Jones & Boalt for Appellant.

Crawford & Mayock and Owen D. Richardson for Respondents.

KNIGHT, J.—The purpose of this action was to recover damages for the alleged breach of two written contracts for the purchase and sale of wine grapes. Judgment was for the defendants and plaintiff appeals.

At all times herein mentioned defendants were engaged in the business of buying and shipping wine grapes near Gilroy, and plaintiff was a grower of grapes in that locality. On September 21, 1922, the parties entered into a contract calling for the delivery of fifty tons of grapes, suitable for eastern shipment, at $95 a ton, and on September 28, 1922, made a second contract for the purchase and sale of the balance of plaintiff's crop, estimated to be fifty tons, at $100 a ton. Defendants accepted delivery of approximately nineteen and one-half tons of grapes under both contracts, whereupon, and on November 3, 1922, they refused to accept further deliveries upon the ground that said grapes had been rendered unsuitable and unfit for eastern shipment as a result of rain and frost. The main question presented for determination is whether or not the trial court was correct in its conclusion that the termination of these transactions by defendants was authorized by the provisions of the contracts.

The documents were prepared on printed forms furnished by defendants, and are substantially alike, except as to the quantity and variety of grapes, and the price to be paid therefor. Those portions of the contract material for consideration read as follows:

"That in consideration of One Dollar, and other valuable consideration hereinafter specified, the Seller has sold, and the Buyer has bought all of the hereinafter mentioned fruit crop, suitable for Eastern shipment, produced during the year 1922 on the following described premises:

"Irene Gibbs Ranch, Valley View Vineyard, Gilroy.

"The Seller agrees to pick and deliver all of said fruit at his own expense, in good condition, entirely free from mildew, or smut, or rain, or sand damage, and free from any damage whatsoever, and at the times directed by the Buyer. All clippings, faulty and damaged fruit to be weighed and charged back to Seller as culls.

"The contract is understood by the parties hereto to constitute an immediate sale transferring title to Buyer, but until delivery has been completed, Seller agrees to, and does assume all risks of loss, depreciation or damage, of whatsoever kind or nature, to any undelivered part of said crops.

"Seller declares he is sole and absolute owner of the crops herein sold, and a sale of the real property shall not affect the rights of the Buyer herein. . . .

"Vineyard Run—It is understood and agreed that grapes when purchased under this contract and designated as 'vineyard run' shall be sound ripe grapes, free from mildew, smut or rain damage and shall contain not more than five (5) per cent by count of raisins or immature sun burned grapes, and shall comply with any rule or rules, law or laws, regulating the shipment, sale and distribution of unpacked grapes. . . .

"The Buyer shall issue proper receipt or weight certificate covering each delivery of fruit made by the Seller and shall make cash payment within ten days for said fruit upon surrender of such receipt or weight certificate, less weight of culls, shown on regular cull weight certificate, at its office in Gilroy, California, or upon surrender of such weight receipt or weight certificates to its authorized representative at Gilroy, California.

"In the event of a strike, quarantine, boycott, embargo, fire or failure of transportation companies to provide refrigerator cars, shortage of box material, or other reasons beyond our control, directly or indirectly affecting Buyer's ability to perform this contract, Buyer may cancel this contract, or extend time of delivery for a period equal to that so lost, and may designate a different reasonable point of delivery, and Buyer shall not be held liable for any damage that may occur through such delay. . . .

"Time is of the essence of this agreement, and no understanding other than herein expressed shall vary or modify this transaction."

[1] The term "suitable for Eastern shipment" used in said contracts, has a definite meaning in the grape-shipping industry, indicating a condition that will permit the fruit to be shipped to and arrive at eastern points in sound condition, allowing normal time for transportation.

It appears from the evidence that the grape-shipping season in the vicinity of Gilroy begins between the fifth and the fifteenth days of September and continues until about November 15th, the heaviest shipping being done in October. During the entire shipping season of 1922 a serious shortage of refrigerator cars existed, due to strikes and also to an embargo on eastern shipments declared by various transportation companies. All available cars were distributed to the shippers in proportion to the amount of acreage contracted for. Sometimes the car shortage was less tensive than at other times. Under ordinary conditions it required twelve days to transport grapes from Gilroy to New York, but during the strike period double that time was consumed. These unfavorable transportation conditions necessarily limited and delayed acceptance of deliveries of grapes, and, consequently, up to October 27th, less than one-fifth of the plaintiff's entire crop had been delivered and accepted under both contracts. On October 27th and 28th the regions of Gilroy were visited by rains and frost, the effects of which weakened the fiber of the grapes, produced mildew, and thereby rendered the grapes unsuitable for eastern shipment. Thereupon, and on November 3, 1922, defendants informed plaintiff that they would not accept the balance of the crop. Plaintiff at that time protested that the grapes were not sufficiently damaged to disqualify the remainder of the crop from acceptance under the contracts, and requested that an inspection thereof be made by disinterested persons, but defendants failed to respond to this proposition and stood upon their refusal to accept the same. Later, under date of November 8, 1922, plaintiff wrote defendants to the effect that she was harvesting and marketing, for defendants' account, all grapes covered by said contracts, and would hold defendants responsible for the difference between the amount of the proceeds received from the

73 Cal. App.—47

sale of the grapes and the contract prices.  Between the sixth and eleventh days of November heavy rains occurred in that locality.  On November 11th defendants wrote plaintiff as follows: "You are hereby notified that we are ready at any time to receive the black grapes which we contracted to buy from you, and we hereby notify you to deliver the same, providing the grapes are undamaged, and in fit and proper condition for shipping as provided in our contract. . . . " Subsequent to the refusal of defendants to accept the grapes on November 3d, however, plaintiff sold the balance of the crop to others for the best obtainable market price, realizing therefrom $7,245.01 less than she would have received from defendants under the prices fixed by said contracts.  Plaintiff's action is for the recovery of that difference in amount.

The trial court found that the existence of said embargo and strikes, and the failure of transportation companies to provide cars, directly affected the ability of defendants to perform their contracts; that on October 27th and 28th the grape crop was rendered unsuitable and unfit, by rains and frost, for eastern shipment, and that said defendants, on the third day of November, 1922, notified the plaintiff that said contracts were canceled, by reason of said crops of grapes having become unsuitable and unfit for eastern shipment, as a result of rain and frost.

The decision of the trial court upon these issues of fact is not open to review, inasmuch as its determination thereon is supported by substantial evidence. [2] We are concerned, therefore, with only the legal question of whether the termination of said contracts by the defendants, under the circumstances shown by the findings, and upon the grounds stated therein, was authorized by the terms of said contracts.  We are of the opinion that the conclusion reached by the trial court upon this question must be sustained.

It will be noted that the contracts called for a "fruit crop suitable for Eastern shipment."  The grade of grapes specified constituted the paramount feature of the contracts. The quality of the grapes to be delivered was further particularized by a provision requiring that they should "be sound grapes, free from mildew, smut or rain damage . . . " The cancellation section of said contracts, after enumerating seven specific causes for cancellation, provided that for "any

other reason beyond our (Buyer's) control, directly or indirectly affecting Buyer's ability to perform the contract, Buyer may cancel this contract . . . '' It was furthermore expressly provided that until completion of delivery the ''seller agrees to, and does assume all risks of loss, depreciation or damage, of whatsoever kind and nature, to any undelivered part of said crop.'' In view of the established fact that the grapes were spoiled by rains and frost prior to completion of delivery, these plain provisions of the contracts manifestly gave to the defendants the right to terminate the sale thereunder, for the reason that the subject matter of the contracts has been destroyed, and the sole purpose for which the engagements were entered into had been defeated, namely, the obtaining of grapes suitable for eastern shipment.

[3] It is a fundamental rule of contracts that where, from the nature of the contract, it is evident that the parties contracted on the basis of the continued existence of the thing to which it relates, the subsequent perishing or destruction of the thing will excuse the performance; and, consequently, when the contract relates to any dealing with specific things, in which the performance necessarily depends on the existence of the particular things, the condition is implied by law that the impossibility arising from the destruction of the things, without fault in the party, shall excuse the performance, because, from the nature of the contract, it is apparent that the parties contracted on the basis of the continued existence of the subject of the contract (9 Cyc. 631, quoted approvingly in *Potts Drug Co.* v. *Benedict,* 156 Cal. 322 [25 L. R. A. (N. S.) 609, 104 Pac. 432]; 6 Cal. Jur., p. 443; 5 Page on Contracts, 2d ed., sec. 2709). [4] True, title to all grapes grown by plaintiff and suitable for eastern shipment was, by these contracts, vested in the buyers at the time the contracts were signed, but it was also provided, as already pointed out, that until completion of delivery the seller agreed to and did ''assume all risks of loss, depreciation or damage, of whatsoever kind and nature, to any undelivered part of said crop.'' It necessarily follows that when the elements spoiled the undelivered portion of the crop so that the grapes became useless for the purpose for which the purchase and sale thereof was made, the loss fell upon plaintiff as the seller.

[5] Plaintiff contends that the cancellation of the contracts, for the reasons found by the court, was not authorized by the contracts or the pleadings, and that, therefore, there has been in fact no legal cancellation thereof. Supporting this contention, plaintiff argues that the contracts embodied two distinct features, one dealing with their performance, which had particular reference to the alternative to be exercised by the buyer in the event the fruit was damaged, and the other having to do with the cancellation of the contracts; that performance of the contracts by defendants was a necessary prerequisite to the exercise of their right to reject damaged fruit, that is, that it was necessary for them first to perform the contracts by receiving the fruit and then afterwards ascertain the damage, if any, and charge it back to the seller under the provision of the contracts requiring that "all clippings, faulty and damaged fruit (should) to be weighed and charged back to Seller as culls"; that such was the exclusive remedy available to the buyer in the matter of rejecting damaged crops. In reference to the other feature of the contract permitting cancellation, plaintiff contends that the buyer was restricted to the specific causes therein stated, which, she claims, do not include the element of damaged crops. It is further asserted that these two remedies arising under different phases of the contract were inconsistent with each other; that both could not be invoked nor was one available to accomplish the purposes of the other.

We are satisfied the propositions thus advanced by plaintiff are not maintainable. It may be conceded, as plaintiff contends, that final refusal of defendants to accept the balance of the crop was based, as found by the trial court, upon the fact that the fruit was rendered unsuitable, on account of rain and frost, for eastern shipment; and it is also true that the matters set forth in the findings relating to the car shortage was important only for the purpose of showing that defendants were justified in delaying deliveries of grapes and that those justifiable delays directly affected the ability of defendants to perform their contracts up to the time the fruit was ruined by the elements for eastern shipment. But the findings in this respect are in full accord with the defense pleaded in defendants' answer, it being there alleged, after setting forth all of these facts and cir-

cumstances, as follows: "Defendants further aver, in that behalf, that on or about the said date, and by reason of said matters hereinbefore set forth, which directly affected their ability to perform said contracts, and each of them, the Defendants notified said Plaintiff that said contracts, and each of them, were and thereafter would be canceled, pursuant to the terms of said contracts, and each of them."

[6] And in reference to the questions of the construction of the contracts, and of the availability of defendants' remedies thereunder, it is our opinion that not only pursuant to the cancellation section of said contracts, but also independently of it, defendants were entitled to terminate said contracts for the reasons assigned by the court in its findings which were in effect that the subject matter of said contracts had been destroyed; and it is entirely immaterial, we think, whether such termination be construed as a "cancellation" of the contracts, or "an excuse for non-performance," for both remedies arise out of the same state of facts and are, to all intents and purposes, controlled by the same legal principles. In claiming that the so-called cancellation section did not allow defendants to cancel the contracts on account of spoiled fruit, plaintiff fails, we think, to give full effect or proper interpretation to the concluding portion thereof, which allows defendants to cancel the contracts for reasons beyond their control and affecting their ability to perform the same. The whole of each contract must be taken together and effect must be given to every part thereof, each clause helping to interpret the other (Civ. Code, sec. 1641). When the parties entered into their engagements they must have contemplated that the vital condition of fulfillment was that only such grapes be delivered, received and shipped as proved suitable for eastern shipment. The seven specific causes contained in said cancellation section obviously related to matters which might either delay or wholly prevent the accomplishment of that purpose, namely, the delivery, acceptance and shipment of such fruit as was suitable for eastern shipment; and the eighth clause of said cancellation section, being general in its operation and effect, manifestly included all other reasons, beyond the control of the buyers, which caused delay or wholly prevented the delivery, acceptance and shipment of a grade of fruit contracted for. The fact that the grapes were rendered unsuitable by the elements for

the purpose for which they were purchased and sold, therefore wholly prevented delivery, acceptance and shipment thereof, made performance of the contracts an impossibility and consequently constituted ground for cancellation.

The subject matter of these contracts was highly perishable and of necessity required expeditious handling even if delivered in condition for eastern shipment; consequently, the interests of the seller as well as of the buyer demanded that the right of cancellation be exercised as to the whole crop if the fruit did not measure up to the high standard prescribed by the contracts; it would therefore seem that the only reasonable and fair construction that can be placed upon the general clause of said cancellation section is that impairment of the subject matter of the contracts, arising from causes beyond the control of the buyer, which made it unfit for the purpose for which it was purchased, warranted cancellation of the contracts.

But, as above stated, aside from the question of cancellation under the clause of the contract just adverted to, we are convinced that upon ascertainment of the fact that the subject matter of the contracts had been rendered useless, defendants were entitled, under the fundamental rule of contracts hereinbefore mentioned, to terminate said contracts on that ground. [7] And, in order to do so, it was not necessary, as plaintiff contends, that all of the fruit should have been first harvested, delivered and culled, for the reason that the crop was not partially but entirely spoiled. It was not a case of sorting out from a larger lot the faulty and damaged fruit, and it would have been an obviously idle act for the seller to have delivered the balance of the crop, consisting of some ninety-odd tons, to the buyer merely for the purpose of having the entire lot weighed and charged back to the seller as faulty fruit; besides, by such an operation the interests of the sellers would have suffered more than those of the buyers, because, in addition to the expense of hauling and delivery, the delay occasioned thereby would doubtless have affected subsequent sale of the crop by the grower to local markets.

We find nothing in the record indicating that defendants were not diligent in the exercise of their legal rights under

the contracts· or that they have acted in a manner not warranted by the provisions thereof. True, deliveries of grapes were delayed at defendants' instance until finally the rains and frosts came and spoiled the grapes for eastern shipment; but owing to transportation conditions it was the legal right of defendants, under the plain reading of the contracts, to effectuate such delays, and the evidence given by transportation officials, to the effect that the car shortage situation looked brighter sometimes than it did at others, is sufficient to show that defendants' conduct in the premises, both as to causing delays in delivery and in failing to cancel the contracts absolutely upon that ground before the grapes were spoiled, was based upon the faith of the information received by defendants from those officials. But as soon as it was ascertained that the rains and frosts of October 27th and 28th had ruined the grapes for eastern shipment, the car shortage question ceased to be a factor, and defendants immediately notified plaintiff that they could not accept the balance of the crop.

[8] Plaintiff during oral argument complained that the contracts in thus giving to the buyers absolute control of the delivery of the crop were harsh upon the grower. This was not denied by the defendants, but as an offset thereto defendants called attention to the risk assumed by them as buyers and shippers in dealing with a highly perishable product even when there was no interference with deliveries or shipment. However that may be, the parties having voluntarily entered into such agreements, the provisions and purposes of which were admittedly legal, defendants are entitled to have the terms thereof carried into effect.

[9] The contents of the letter written by defendants to plaintiff under date of November 11th is unimportant, for the reason that the contracts at that time had already been canceled, defendants on November 3d having expressly refused to proceed with the sale, and plaintiff acting upon such refusal thereafter disposed of the grapes to other parties. The question of waiver of the right to cancel the contracts upon the ground of car shortage conditions is also immaterial, because final refusal to take the crop was not placed on that ground.

The other points made by plaintiff were incidental to those theories advanced by plaintiff which we hold are not maintainable.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 24, 1925.