### PARRISH v. STRATTON CRIPPLE CREEK MINING & DEVELOPMENT CO.

### No. 2139.

Circuit Court of Appeals, Tenth Circuit.

Nov. 4, 1940.

Rehearing Denied Dec. 9, 1940.

Writ of Certiorari Denied March 10, 1941.

See 61 S.Ct. 738, 85 L.Ed. ——.

---

William H. Scofield, of Denver, Colo. (Andrew J. Reynolds and John J. Morrissey, both of Denver, Colo., on the brief), for appellant.

Thomas M. Burgess, of Colorado Springs, Colo., (David P. Strickler, of Colorado Springs, Colo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

E. F. Parrish brought this action against The Stratton Cripple Creek Mining & Development Company,[1] a corporation organized under the laws of Wyoming, to recover damages for alleged breach of contract. The action resulted in a summary judgment in favor of the Mining Company upon the facts disclosed by the pleadings and a pre-trial stipulation. The facts thus disclosed are these: The Mining Company is the owner of extensive gold mining properties in the Cripple Creek District, in Teller County, Colorado. On June 14, 1935, the Mining Company entered into a contract with The Cripple Creek Milling Company[2] whereby the Milling Company agreed to build and operate, on a tract of land belonging to the Mining Company and situated in the Cripple Creek District, a mill for the treatment of gold ore produced from the mining properties of the Mining Company. The contract provided that the mill should be completed not later that six months from June 14, 1935, should be erected under the supervision of competent engineers, modern in all respects, and capable of treating at least 300 tons of ore per day; that the processes and metallurgy to be used in the mill should be subject to approval by a person designated by the Mining Company and adapted to the treatment of ore from the Cripple Creek District; that the Mining Company should be given the right to inspect all operations of the Milling Company; that the Milling Company would promptly discharge any man employed on or about the premises at the request of the Mining Company; that if improvements should be made in mining machinery or in the process of treatment, the Milling Company would equip the mill with such improved machinery and install the improved process; that the Milling Company should have the exclusive right to treat all ores produced from a designated portion of the Mining Company's properties for a term of 25 years; that the Milling Company would treat all ores produced by the lessees of the Mining Company not to exceed 300 tons per day; that the Mining Company should have the right to purchase the mill from the Milling Company during the life of the contract at its replacement value; that the Milling Company should have the right to terminate the contract by giving the Mining Company sixty days' written notice and that the latter should then have the right to purchase the mill at its then fair value. The mill was completed and put in operation in August, 1935. It had a capacity of 500 tons per day. The Myron Stratton Home, a corporation, the owner of all the stock of the Mining Company, advanced in excess of $200,000 to the Milling Company to aid the latter in financing the cost of constructing the mill.

On September 27, 1935, the Mining Company and Parrish entered into a written contract wherein it was recited that the Mining Company had contracted with the Milling Company for the treatment of ore "to be delivered" at the latter's mill, and that it was to the Mining Company's advantage that such "delivery" be made by a trucking company able to haul the ore in all weathers and seasons, and that Parrish represented he was able and willing to furnish such trucking service, and that he would "haul and deliver to said * * * mill all ore produced" by the Mining Company; and in which the Mining Company agreed to give to Parrish "the exclusive hauling of all ore produced on its property and *destined*"[3] to the mill of the Milling

---

[1] Hereinafter referred to as the Mining Company.

[2] Hereinafter referred to as the Milling Company.

[3] Italics ours.

Company, and to employ Parrish "to haul all ore produced by it on its own account," and to instruct its lessees "to employ * * * Parrish to haul all ore produced by them and *destined*" [3] to such mill. The contract further provided that the Mining Company and its lessees should pay Parrish for such hauling twenty-five cents per ton for the first mile and ten cents per ton for each additional mile or fraction thereof from the point of loading to the point of delivery at the mill bins. The contract further provided:

"This agreement, * * * shall be for five (5) years from October 1st, 1935, unless sooner terminated for failure to comply with its conditions. * * *

"This contract shall not be construed as creating a joint enterprise, or as the creation of any contract of agency or employment, but shall be construed solely as according an exclusive privilege to an independent contractor upon the terms and conditions hereinabove set out."

Parrish purchased a large amount of equipment and built and improved roads to enable him to perform his contract with the Mining Company. He entered into the performance of the contract on September 27, 1935. From that date to January 24, 1937, Parrish and the Mining Company and its lessees performed and carried out the provisions of the contract.

During that period there were times when the ore produced by the Mining Company's lessees did not equal 300 tons per day and Parrish hauled ore for other mining operators in the Cripple Creek District and was so engaged on January 24, 1937.

On the last-mentioned date, the Milling Company discontinued operation of its mill and it did not thereafter reopen the mill nor accept any ore for treatment. It was adjudicated a bankrupt on October 21, 1938, and on May 6, 1939, the mill was sold by the trustee in bankruptcy to Alfred G. Brown.

Neither the Milling Company nor the Myron Stratton Home had or exercised any control of the Milling Company by stock ownership or otherwise, and the act of closing the mill was wholly that of the Milling Company.

Prior to the erection of the mill, all the Mining Company's lessees made separate and individual arrangements with truckers for the transportation of the ore produced by them. Upon the closing of the mill, the Mining Company informed its lessees that they were no longer required to permit Parrish to haul their ore. After the closing of the mill, Parrish contacted the lessees of the Mining Company and made arrangements with certain of them to transport their ore from the mines to railroad sidings for shipment to the Golden Cycle Mill at Colorado Springs, Colorado. These arrangements continued from January 24, 1937, to February 10, 1937. Since the latter date, ore produced by the lessees has been hauled by other truckers to railroad sidings for transportation to the Golden Cycle Mill. The average distance from the mines to the railroad sidings is one-seventh the average distance from the mines to the mill. Since September 27, 1935, all of the mine operations of the Mining Company have been conducted by and through its lessees.

It will be noted that the contract between Parrish and the Mining Company dealt only with ore "destined" to the Milling Company; that the Mining Company had no power to compel the Milling Company to continue operation of the mill; that the Milling Company could discontinue operation on sixty days' notice to the Mining Company; that the Mining Company did not obligate itself to cause the mill to be operated during the life of its contract with Parrish; and that on cessation of operation of the mill there was no other mill available to which ore could be delivered for treatment under facts and circumstances substantially like those under which it was hauled and delivered to the mill of the Milling Company. The only other milling service available was at the Golden Cycle Mill at Colorado Springs, and the average haulage distance from the mines to railroad sidings for shipment to the Golden Cycle Mill was approximately one-seventh the average haulage distance to the mill of the Milling Company.

Performance of the contract was, therefore, dependent on the continued operation of the mill by the Milling Company and operation was terminated because of the financial failure and ensuing bankruptcy of the Milling Company and was in no wise due to the fault of the Mining Company.

■ While we find no Colorado decision on the point, it is well settled by the adjudicated cases in England and the United States that where parties enter into a contract on the assumption that some par-

ticular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that if, without the fault of either party, the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it.[4]

Mr. Williston, in his Revised Edition of his work on Contracts, § 1948, states the principle as follows: "Not only where a specific thing is itself to be sold or transferred, but wherever a contract required for its performance the existence of a specific thing, the fortuitous destruction of that thing, or such impairment of it as makes it unavailable, excuses the promisor, unless he has clearly assumed the risk of its continued existence," and cites Operators' Oil Co. v. Barbre, 10 Cir., 65 F.2d 857, 861, 862, where this court held that if performance is rendered impossible by proceedings in a receivership of a third party for which the promisor is in no wise responsible, performance by the promisor is excused.

It is urged that the Mining Company was obligated by its contract with Parrish to cause the continued operation of the mill during the life of the Parrish contract, even by the exercise of its option to acquire the mill in the event the Milling Company ceased operations. Certainly, there was no express provision in the Parrish contract so obligating the Mining Company and we do not think that such an obligation may be implied. Both parties contemplated and contracted with respect to the continued operation of the mill by the Milling Company. Both knew that the Milling Company could cease operations on sixty days' notice. No express provision was made for the substitution of other milling facilities in the event the Milling Company should cease operation of its mill. No requirement was made that the Mining Company should provide another mill or acquire and operate the Milling Company's mill in the event the latter ceased operation. Absent such provisions, we do not think the Mining Company was obligated to take over a losing venture merely because it reserved an option in its contract with the Milling Company to acquire the mill.

Counsel for Parrish urge that performance by the Mining Company was not excused because performance was possible with only an unsubstantial variation, citing Restatement, Contracts, § 463, p. 871. It cannot be said that for the Mining Company to take over, and assume the burden of operating the mill, a losing venture, was not a substantial variation from a situation where its sole obligation was to cause its lessees to employ Parrish to haul ore from the mines to the mill, and there was no other available mill capable of rendering a satisfactory milling service, and so situated that the haulage distances and conditions would be substantially like those under which ore had been hauled and delivered to the mill of the Milling Company.

Had the Mining Company covenanted to cause the mill to be operated by the Milling Company during the life of the Parrish contract, although it had no power over the actions of the Milling Company, cessation of operation of the mill would not have excused the Mining Company from performance of the Parrish contract. But, as we have undertaken to show, the Mining Company did not so obligate itself, either expressly or impliedly.

We, therefore, conclude that the contract was subject to the implied condition that if, without fault of either party, the mill ceased to operate and to be available, the parties should be excused from performing it.

The judgment is accordingly affirmed.

---

[4] Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 629, 41 S.Ct. 612, 65 L. Ed. 1123; The Claveresk, 2 Cir., 264 F. 276, 283; The Tornado, 108 U.S. 342, 351, 2 S.Ct. 746, 27 L.Ed. 747; Dow v. State Bank, 88 Minn. 355, 93 N.W. 121, 123; Heimburger v. Holtapp, 206 Ill. App. 602, 609; Taylor v. Caldwell, 122 Eng.Rep. 309, 312; Howell v. Coupland, L.R. 9, Q.B. 462; Dexter v. Norton, 47 N.Y. 62, 65-67, 7 Am.Rep. 415; The Isle of Mull, 4 Cir., 278 F. 131, 134; North American Oil Co. v. Globe Pipe Line Co., 8 Cir., 6 F.2d 564, 567; Israel v. Luckenbach Steamship Co., 2 Cir., 6 F.2d 996; Walker v. Tucker, 70 Ill. 527, 543; Shear v. Wright, 60 Mich. 159, 26 N.W. 871, 872; Bruce v. Indianapolis Gas Co., 46 Ind.App. 193, 92 N.E. 189, 191; Gibbs v. Hersman, 73 Cal.App. 732, 239 P. 350, 352; Strong v. Moore, 105 Or. 12, 207 P. 179, 183, 23 A.L.R. 1217; Tulsa Opera House Co. v. Mitchell, 165 Okl. 61, 24 P.2d 997, 1000; Note, 12 A.L.R. p. 1273; Restatement, Contracts, §§ 281, 460.