**Charles DOWNING and Christine Downing, Appellants (Plaintiffs),**

v.

**Janice STILES and Security State Bank of Basin, Appellees (Defendants).**

No. 5503.

Supreme Court of Wyoming.

Nov. 5, 1981.

R. B. Bowman and Mark Reynolds, of Bowman & Reynolds, Lovell, for appellants.

Nancy G. Hinckley and Robert A. Gish, Basin, for appellees.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

ROONEY, Justice.

Appellants-plaintiffs carried on a retail liquor business (hereinafter referred to as Rustler Bar) in a building owned by them in Basin, Wyoming. They were also partners with appellee-defendant Stiles (hereinafter referred to as Stiles) in a restaurant busi-

ness styled Maverick Recreation Center (hereinafter referred to as Maverick), which was carried on in the basement of the same building. Much of Maverick's business resulted from patronage by Rustler Bar's customers.

Appellants sold Rustler Bar and the building to Dennis D. Morris, the person who had been managing Rustler Bar for appellants. Subsequently, on June 12, 1976, appellants sold their half interest in Maverick to Stiles. The terms of this sale were set forth in a purchase agreement. The purchase price was $25,000.00 to be paid in semi-annual installments. Stiles was to maintain "adequate" casualty insurance on the fixtures and inventory, with the proceeds of insurance to be paid as interest shall appear. A schedule of fixtures and inventory was attached to the agreement, listing the value thereof at $7,824.60. Stiles insured the fixtures and inventory for $25,-000.00 [1] with Firemen's Insurance Company of Newark, New Jersey (hereinafter referred to as insurance company). The policy did not contain a loss payable clause to anyone other than Stiles. Stiles gave appellants a chattel mortgage on the fixtures and inventory, but it was not recorded. Stiles also gave appellants a promissory note dated June 12, 1976 for $25,000.00 payable in semi-annual installments and with interest at 10% per annum. With appellants' help, Stiles obtained a five-year lease from Rustler Bar for the basement of the building.

Thereafter, the business of Rustler Bar decreased, and the bar finally ceased doing business in June 1978. On January 21, 1979, a fire destroyed the building and its contents. Stiles stopped making payments on the note on December 12, 1978.

On April 17, 1978, Stiles gave a promissory note for $6,625.00 to appellee-defendant Security State Bank of Basin (hereinafter referred to as bank). It drew interest at the rate of 10%. A security agreement and financing statement covering the equip-

1. Stiles testified that the insurance covered items purchased by her subsequent to the purchase of Maverick. There was testimony that the $7,824.60 figure was for tax purposes and was not actual value.

ment of Maverick to secure payment of the note was recorded. The note has not been paid.

Appellants set forth two claims for relief in their amended complaint. The first claim was against Stiles on the June 12, 1976 note for the balance due of $19,612.00 with interest. The second claim was against Stiles, the bank and the insurance company. It alleged that the insurance company had issued a draft payable to appellants, to Stiles and to the bank in the amount of $25,000.00 and that the proceeds thereof should be used first to pay appellants' claim.

The parties then stipulated that the proceeds of the draft be deposited through the court in an interest-bearing account in the names of the attorneys of appellants, Stiles and bank, subject to disbursement in accordance with the judgment of the court or on mutual agreement of the parties, and that the insurance company be dismissed as a defendant.[2]

In its amended answer and crossclaim, bank requested judgment against Stiles for the amount of her note dated April 17, 1978 with interest, attorney fees and costs.[3]

After a trial to the court, the court found that Stiles should be relieved of further payment on her note to appellants under the "doctrine of commercial frustration," inasmuch as Maverick "was dependent on the business with the Rustler Bar" and "the value of performance was destroyed" by the failure of Rustler Bar. It found, however, that appellants were entitled to a judgment against Stiles for $3,065.12 to be paid from the insurance proceeds.[4] It also gave bank a judgment against Stiles on the note dated April 17, 1978, the same to be in the amount of the note, $6,625.00 with interest and with attorney fees in the amount of $2,500.00, all

to be paid from the insurance proceeds. It found that Stiles should have the remainder of the insurance proceeds.

Appellants word the issues on appeal as follows:

1. "Did the trial court err in permitting Defendant Security State Bank of Basin to share in the fire insurance proceeds, even though the bank was not a party to the fire insurance contract?"

2. "Did the trial court err in applying the doctrine of 'Commercial Frustration' to the business failure of the 'Rustler Bar', or was this an ordinary business risk which was foreseeable by the parties?"

3. "Did the trial court err in computing the insurable interest of plaintiffs Charles Downing and Christine Downing in the proceeds of the insurance, to be only $3,065.12, rather than the unpaid balance owed by Defendant Janice Stiles to Plaintiffs under the purchase agreement and promissory note, which amounted to $19,613.00 [sic] principal and $4,364.85 interest, or a total of $23,-976.85?"

4. "Did the trial court err in allowing Defendant Security State Bank of Basin to recover the sum of $2,500.00 in attorney fees although no evidence was presented showing any such amount was paid by said Defendant, or billed by its attorney?"

We find that the trial court erred in applying the doctrine of "commercial frustration" and in allowing the bank to recover attorney fees without foundation evidence to support the amount thereof. Although the lien interests of the bank and appellants were less than the total amount of the insurance proceeds, all of such proceeds are subject to the claims of the parties pursuant

2. The record does not contain an order dismissing the insurance company as a party, but the court and parties proceeded in the action as if the insurance company were no longer a party.

3. Although Stiles filed an answer to the bank's crossclaim, and although she filed an answer and counterclaim to appellants' original complaint, the record does not contain her answer to the amended complaint. However, she was

allowed to participate in the pretrial conference and in the trial and judgment was entered in her favor.

4. The figure represented appellants' claim against half of the value listed on the schedule attached to the purchase agreement, reduced by payments already made in the proportion that the value of the fixtures and inventory bears to the total purchase price.

to their stipulation. Accordingly, we reverse and remand the case for the purpose of entering an appropriate judgment.

## FRUSTRATION

With reference to "frustration," the trial court made the following two findings upon which Stiles was "relieved of any further obligation under the purchase agreement * * * and the note * * * *":

"5. That the evidence shows that the Maverick Recreation Center, owned by the Defendant, Stiles, was dependent on the business with the Rustler Bar, and that without it, the center was not a viable operation. That the value of performance was destroyed by the frustrating event, which was the failure of the Rustler Bar.

"6. That under the doctrine of commercial frustration, the Defendant, Stiles, should be relieved from any further payments under and by virtue of her Contract with the Plaintiffs."

The doctrine of "commercial frustration" or "frustration of the venture" or "discharge of commercial contract by supervening frustration" in the law of contracts "has been said to be a relatively modern one." 17A C.J.S. Contracts § 463(2)b. See Calamari & Perillo, Contracts 2d ed. § 13–1. It grew out of the so-called coronation cases initiated in *Krell v. Henry*, 2 K.B. 740 (1903) wherein a defendant was excused from payment for use of an apartment from which to view the coronation proceedings of King Edward VII because the proceedings were cancelled when the king became ill. Calamari & Perillo, supra, § 13–10; *Howard v. Nicholson*, Mo.App., 556 S.W.2d 477, 481 (1977). It is akin to the doctrine of impossibility of performance of a contract, and the two doctrines are often treated under the same heading in encyclopedias and textbooks, e. g., 18 Williston on Contracts (3rd ed.) § 1946, et seq.; 6 Corbin on Contracts, § 1353, et seq.; Calamari & Perillo, supra, § 13–1; 17A C.J.S. Contracts § 462(2); 17 Am.Jur.2d Contracts § 400, et seq. However, the generally recognized distinction between the two doctrines lies in the inability to literally perform (impossibility) and the impracticability to perform (commercial frustration). 17 Am.Jur.2d Contracts § 401; 17A C.J.S. Contracts § 463.

" * * * The doctrine of commercial frustration is close to but distinct from the doctrine of impossibility of performance. Both concern the effect of supervening circumstances upon the rights and duties of the parties but in cases of commercial frustration '[p]erformance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event, which supervenes to cause an actual but not literal failure of consideration.' *Lloyd v. Murphy*, 25 Cal.2d 48, 153 P.2d 47, 50 (Cal. en banc 1944)." *Howard v. Nicholson*, supra, 556 S.W.2d at 482.

More than one rationale has been advanced for the doctrine of commercial frustration:

"In construing contracts, the doctrine reads into them, in the absence of repellent circumstances, *an implied condition* that the promisor shall be absolved from performance if, through a supervening circumstance for which neither party is responsible, a thing, event, or condition which was essential so that performance would yield to the promisor the result which the parties intended him to receive, fails. The general principle underlying the doctrine of commercial frustration is that where the purpose of a contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance, the contract will be discharged. The doctrine is predicated on the premise of giving relief in a situation where the parties could not provide themselves, by the terms of the contract, against the happening of subsequent events, so, if the intervening or supervening event was reasonably foreseeable, or was controllable by the parties, they may not invoke the principles of the doctrine as a defense to escape their obligations. It applies to executory contracts alone." (Emphasis added.) 17A C.J.S. Contracts § 463(2)b, pp. 620–621.

"Changed conditions supervening during the term of a contract sometimes operate as a defense excusing further performance on the ground that there was *an implied condition in the contract* that such a subsequent development should excuse performance or be a defense, and this kind of defense has prevailed in some instances even though the subsequent condition that developed was not one rendering performance impossible, some of the cases not referring in any way to impossibility. In such instances, where performance had not become impossible, but achievement of the object or purpose of the contract was frustrated, the defensive doctrine applied has been variously designated as that of 'frustration' of the purpose or object of the contract or 'commercial frustration.' Accordingly, it has been held that an event which substantially *frustrates the objects contemplated by the parties* when they made the contract excuses nonperformance of the contract. In such a case it is sometimes said that the *foundation of the contract is gone.*" (Emphasis added.) 17 Am.Jur.2d Contracts § 401, p. 847.

" * * * Where the object of one of the parties is the basis upon which both parties contract, the duties of performance *are constructively conditioned* upon the attainment of that object. * * *

"The courts agree that the doctrine of frustration of the venture does not apply unless the *frustration is 'total or nearly total.'* However, there is difficulty in determining what is 'total or nearly total' frustration. * * * " (Emphasis added.) Calamari & Perillo, supra, § 13–10, pp. 495–496.

"Contract liability is no-fault liability. The fundamental maxim is *pacta sunt servanda* —agreements must be kept. Even if performance is impossible or senseless, the assessment of damages for non-performance remains a possibility. What policy judgments have been made to create the limited excuses for non-performance discussed in this chapter? [Chapter 13, Impossibility or Impracticability of Performance and Frustration of the Venture.] There appear to be several. The first stems from one of the underpinnings of contract obligations. Contract liability stems from consent. *If an event occurs which is totally outside the contemplation of the parties* and which drastically shifts the nature of the risks ostensibly consented to, is consent real?

"Second, the doctrines of impossibility and frustration are closely allied to the doctrine of mutual mistake. The distinction is that mutual mistake as a doctrine is applicable only if the parties are mistaken as to a vital existing fact, while frustration and impossibility relate to future events. As was stated in the discussion of mistake, ideas of *unjust enrichment are heavily involved.* Before applying the doctrine one must search the facts for unexpected, unbargained for gain on the one hand and unexpected, unbargained for loss on the other.

"Third, notions of *conscionability and fairness* tend to support the doctrines. The law deems it to be unconscionably sharp practice to take advantage of the mistake of another. It may equally be deemed unconscionable to take advantage of a mistake as to the course of future events.

"From the point of view of legal analysis, the doctrines of impossibility and frustration have been explained by two different conceptual models: (1) *the existence of an implied term* ; and (2) *the imposition by law of a constructive condition.* The former is rooted in the idea that one can infer from the facts that the parties did not intend that performance would have to be rendered if an unexpected obstacle would create a radical change in the nature of the performance. This is the prevailing approach in England. In the United States, despite some discrepancy in the cases, it is generally believed that the excuse for non-performance created by the doctrines discussed here are more realistically understood as stemming from rules of law rather than from inferences drawn from the parties' agreement.

"The question of *foreseeability of the unexpected occurrence* is frequently discussed in cases where impossibility or frustration are raised. First, it must be pointed out that the parties are free to allocate the risks of

even unforeseen occurrences. Where they have neither foreseen the subsequent event nor allocated the risks of the unforeseen, various more or less standardized rules have been formulated to allocate some of the risks of this kind. All of these rules involve consideration of whom would the community normally expect to assume the risk of the unexpected occurrence. If the occurrence is reasonably foreseeable, courts often take the position that the promisor has assumed the risk of impossibility or frustration. * * *

\* \* \* \* \* \*

"The importance of foreseeability ought not to be exaggerated, however. As recently pointed out by the Supreme Court of California, 'the question whether a *risk is foreseeable* is quite distinct from the question whether it was contemplated by the parties.' The relevance of foreseeability is that a party's consent to the contract can generally be extended to foreseeable risks. The proper inquiry ought to be whether the *risk was assumed; and the basic test is not foreseeability but whether the parties took the risk into account or whether the contract failed to provide for the situation.*" (Emphasis and bracketed material added.) Calamari & Perillo, supra, § 13–13, pp. 498–501.

" * * * [W]here parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as *subject to an implied condition* that if, without the fault of either party, the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it." (Emphasis added.) *Parrish v. Stratton Cripple Creek Mining & Development Co.*, 116 F.2d 207, 209, 210 (10th Cir. 1940), cert. denied 312 U.S. 698, 61 S.Ct. 738, 85 L.Ed. 1132 (1941).

" * * * The purpose of a contract is to place the risks of performance upon the promisor, and the relation of the parties, terms of the contract, and circumstances surrounding its formation must be examined to determine whether it can be fairly inferred that the *risk of the event* that has supervened to cause the alleged frustration was *not reasonably foreseeable.* If it was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the *risk was assumed.*

"The doctrine of frustration has been limited to *cases of extreme hardship* so that businessmen, who must make their arrangements in advance, can rely with certainty on their contracts. *Anglo-Northern Trading Co. v. Emlyn Jones and Williams*, 2 K.B. 78; 137 A.L.R. 1199, 1216–1221. The courts have required a promisor seeking to excuse himself from performance of his obligations to prove that the *risk of the frustrating event was not reasonably foreseeable* and that the value of counterperformance is totally or nearly totally destroyed, for frustration is no defense if it was foreseeable or controllable by the promisor, or if counterperformance remains valuable. [Citations.]" (Emphasis added.) *Lloyd v. Murphy*, 25 Cal.2d 48, 153 P.2d 47, 50 (1944).

" * * * The doctrine of commercial frustration 'reads into' a contract *an implied condition* * * *." (Emphasis added.) *Howard v. Nicholson*, supra, 556 S.W.2d at 483.

To the utilized rationales of implied condition, constructive condition, allocation of risk, hardship, unjust enrichment, conscionability and fair play, and foreseeability or unexpected occurrences (some of which apply to differing aspects of the doctrine), that of "foundation" or "basic assumption" has been used. See Comment on Contracts—Frustration of Purpose, T. Ward Chapman, Mich.L.Rev., Vol. 59, No. 1, November 1960.

The "basic assumption" rationale has attained additional recognition in the Uniform Commercial Code. Section 2–615 of the Code was enacted as § 34–21–278, W.S. 1977. Such section reads in pertinent part:

"(a) Except so far as a seller may have assumed a greater obligation and subject

to the preceding section [§ 34–21–277] on substituted performance:

"(i) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) [subdivisions (ii) and (iii)] is not a breach of his duty under a contract for sale if performance as agreed *has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption* on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid;" (Emphasis added.)

And the Restatement, Contracts 2d is adopting the same rationale. In Chapter 11, Impracticability of Performance and Frustration of Purpose, Tentative Draft No. 9, it is said in the Introductory Note:

"The rationale behind the doctrines of impracticability and frustration is sometimes said to be that there is an 'implied term' of the contract that such extraordinary circumstances will not occur. This Restatement rejects this analysis in favor of that of Uniform Commercial Code § 2–615, under which the central inquiry is whether the non-occurrence of the circumstance was a 'basic assumption on which the contract was made.' * * * "

Section 285, Restatement, Contracts 2d, sets forth the rule for Discharge By Supervening Frustration:

"Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

Comment *a* thereto states in part:

" * * * First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. * * * "

▬ In consideration of the foregoing, we conclude that the court[5] should apply the doctrine of commercial frustration[6] to

---

**5.** The question of whether or not the doctrine of commercial frustration is applicable in a given case is one of law for the court. Interpretation and construction of a contract is done by the court as a matter of law. *Amoco Production Company v. Stauffer Chemical Company of Wyoming,* Wyo., 612 P.2d 463 (1980). "The question is generally considered to be one of law rather than fact, for the court rather than the jury." Restatement, Contracts 2d, supra, Introductory Note to Chapter 11.

**6.** We are here concerned only with frustration as it pertains to commercial worthlessness of a venture. We are not presented with kindred questions such as frustration due to unknown impediment which existed at the time of contract or discharge by supervening impracticability. (Restatement, Contracts 2d, supra,

§ 281, Comment *d* explains the use of impracticability by the Restatement instead of impossibility by noting that "[a]lthough the rule stated in this Section is sometimes phrased in the term of 'impossibility,' it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible.") The rule stated in § 281, Restatement, Contracts 2d, supra, is specified in §§ 282, 283 and 284 to those things to which it is "traditionally" applied (Comment *a* to § 281), i. e. supervening death or incapacity of person necessary for performance, supervening destruction of a specific thing necessary for performance, and supervening prohibition or prevention by law. We are here concerned with an instance in which there is no impediment to performance

relieve a party to a contract from further performance thereunder only if:

1. The contract is at least partially executory.

2. A supervening event occurred after the contract was made.

3. The non-occurrence of such event was a basic assumption on which the contract was made.

4. Such occurrence frustrated the party's principal purpose for the contract.

5. The frustration was substantial, and

6. The party has not agreed, expressly or impliedly, to perform in spite of the occurrence of the event.

■ In this case, Stiles did not contend that the supervening event was the fire. The discontinuance of the Rustler Bar business was the event designated as supervening. The contract was partly executory, the event occurred subsequent to the making of the contract, and appellants had not agreed, expressly or impliedly, to perform in spite of the occurrence of the event. Although subject to considerable dispute, it may even be said that the non-occurrence of the event was a basic assumption on which the contract was made. But the evidence does not establish the continuation of Rustler Bar's business as the principal purpose for which the contract was made, and, therefore, that the frustration was substantial. Certainly, the frustration was not "total or nearly total."

The principal purpose of the purchase was to carry on a restaurant business. The fact is that such restaurant business was continued to be carried on for six or seven months after the Rustler Bar ceased doing business. It was not until just prior to the fire that Stiles refused to make payment under the contract. This fact reflects the recognition that one of the risks assumed by Stiles under the contract was the decrease and discontinuance of Rustler Bar's business. Because of the lease, Stiles could not be evicted. But Stiles had not sought any provision in the agreement whereby Rustler Bar was bound to use Stiles for its food

service. If such were the principal purpose of the purchase agreement between Stiles and appellants, assurance of such should have been secured along with the lease. And such assurance should designate the extent of such service. For otherwise, where is the line drawn? Can Stiles be discharged from performance of her contract with appellants when service to Rustler Bar's customers falls off 10%? or 25%? or 90%? In the language of Comment *a* to § 285, Restatement, Contracts 2d, supra:

"* * * It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. * * *"

The circumstances of this case are similar to Illustration 7 to this section of the Restatement:

"7. A leases a gasoline station to B. A change in traffic regulations so reduces B's business that he is unable to operate the station except at a substantial loss. B refuses to make further payments of rent. If B can still operate the station, even though at some loss, his principal purpose of operating a gasoline station is not substantially frustrated. B's duty to pay rent is not discharged, and B is liable to A for breach of contract. The result would be the same if the loss were caused by a government regulation rationing gasoline or a termination of the franchise under which B obtained gasoline."

The trial court was not consistent in finding the existence of commercial frustration and yet awarding appellants a recovery for the amount of their interest in the fixtures and inventory, i. e. $3,065.12. If the doctrine of commercial frustration applied, Stiles' obligation to perform would be totally discharged. A like inconsistency exists in the refusal of the trial court to allow appellants to recover on their note under the doctrine of commercial frustration but allows bank to recover on its note without application of the doctrine. The loans rep-

by either party, rather it is an instance in which the performance may be rendered worthless, i.

e., the instance which may be subject to § 285, Restatement, Contracts 2d, supra.

resented by both notes were for the same thing—to finance the operation of Maverick, a restaurant business.

Accordingly, it was error to apply the doctrine of commercial frustration to the circumstances of this case.

## ENTITLEMENT TO INSURANCE PROCEEDS

At the time of the loss occasioned by the fire, bank was not included as a beneficiary under the insurance policy, and Stiles had not agreed with the bank to insure the property upon which bank had a lien. Accordingly, without more, bank would be left to the usual proceedings in execution of a judgment on the note—which may or may not find the insurance proceeds available.

"One who has a mere lien only on the insured property has no claim to the insurance money realized by insured in the event of a loss of the property, for a claim on the insurance money may arise only out of contract; but, where insured has agreed to insure for the benefit of another, who has an interest in the subject of insurance, such other has an equitable lien on the proceeds. * * *" 46 C.J.S. Insurance § 1150. See 5 Couch on Insurance 2d, § 29:64.

However, there is more. Section 34–21–935(a), W.S.1977, defines proceeds in pertinent part as follows:

"(a) 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. * * *"

Bank's security agreement and financing statement reflects a claim on proceeds.

Appellants are in a different position. Although they were not included as a beneficiary under the insurance policy, Stiles did agree to carry insurance on the fixtures and inventory for their benefit. Appellants were vendors to Stiles of one-half interest in the fixtures and inventory. Accordingly appellants could claim an equitable interest in the insurance proceeds equal to the unpaid balance on the sale price of one-half interest in the fixtures and inventory.[7] To collect beyond that on their note, they would be left to the usual proceedings in execution on a judgment.

"Where a vendee, who has contracted to keep the property insured for the benefit of the vendor, takes out insurance in his own name and does not assign it or make it payable to the vendor, the agreement following a loss creates an equitable lien in favor of the vendor upon the proceeds of the policy in the hands of the vendee for the unpaid balance of the purchase price." 5 Couch on Insurance 2d, § 29:103. See 46 C.J.S. Insurance § 1145.

However, the stipulation entered into by all of the parties to the action not only contemplated a determination by the court of the validity of the claims by bank and appellants against Stiles and the priority thereof, but it subjected the insurance proceeds to payment thereof. By the stipulation, Stiles agreed to make the proceeds of the insurance policy available for disbursement "subject to the judgment of this court or the mutual agreement of said parties."

Accordingly, the insurance proceeds were subject to the claims of both the bank and appellants. The amount thereof is more than sufficient to satisfy both the bank's entire claim since it is secured by a lien, and that portion of appellants' claim which is secured by the equitable lien, i. e., $3,065.12. The remainder of the insurance proceeds should also be applied to the claim of appellants. Such application of insurance proceeds will completely discharge the bank's

---

7. The purchase agreement is specific in restricting appellants' interest in insurance proceeds to the value of the fixtures and inventory, i. e. "Buyer shall provide adequate insurance on the fixtures and inventory located within the Business and loss, if any, shall be distributed between the Sellers and Buyer as their interest shall appear." The trial court accurately computed at $3,065.12 the value of appellants' half interest in the fixtures and inventory, with allowance for payments made and attributable to the sale of such half interest.

claim and will discharge a great portion of appellants' claim. Appellants should be left to usual execution to satisfy the balance due on their judgment.

### ATTORNEY FEES

With reference to the only other issue presented in this appeal, appellants and Stiles contest the award of $2,500.00 in attorney fees to bank in connection with its recovery against Stiles on her note.

■ In the absence of statutory or contractual right, attorney fees cannot ordinarily be recovered by a successful party. *Yellowstone Sheep Co. v. Ellis*, 55 Wyo. 63, 96 P.2d 895 (1939). The necessary contractual right was set forth in Stiles' note to the bank. However, appellants point to the complete lack of anything in the record relative to the several factors upon which the reasonableness of attorney fees is normally predicated. Appellants refer to the following from 25 C.J.S. Damages § 91(2):

> "There can be no recovery in the absence of evidence from which the amount to be allowed can be properly determined. Where the amount awarded is fixed by the jury there must be evidence concerning the reasonableness of the fee, but where the amount is fixed by the court the court need not hear any opinion testimony as to the value of the services. The court in passing on the reasonableness of attorney fees sought to be recovered as damages will consider the amount of work and skill entailed, the amount of money involved, and the responsibilities assumed."

We have said that the reasonableness of an attorney's fee must always depend upon facts and circumstances of the litigation and that there must be some proof or evidentiary basis for determination of a reasonable attorney's fee. *Greenough v. Prairie Dog Ranch, Inc.*, Wyo., 531 P.2d 499 (1975).

■ Bank acknowledges that attorney fees should not have been allowed without foundation as to the propriety of the amount thereof. However, it requests that it now be allowed to provide the necessary foundation, but it does not refer us to any authority which authorizes such relief. Ordinarily, damages must be proven as an element of one's claim during the trial. 22 Am.Jur.2d Damages § 296.

■ Of course, there are instances in which a remand on the issue of attorney fees is proper. *Greenough v. Prairie Dog Ranch, Inc., supra*, came to us on appeal from a summary judgment. The question presented was whether or not there was a factual issue as to the amount of attorney fees and, therefore, whether or not evidence should be received relative thereto. We held that there was, and remanded the case to resolve such fact. *Gifford v. Casper Neon Sign Co., Inc.*, Wyo., 618 P.2d 547 (1980) came to us on appeal from a cognovit judgment. Attorney fees were included in the amount as alleged in an affidavit. We remanded the case for proof of such fees and of the amount thereof. In *State Surety Company v. Lamb Construction Company*, Wyo., 625 P.2d 184 (1981), the amount of attorney fees and the right to recover them had been established by evidence during the trial. We remanded the case for the purpose of determining the allocation of such fees between a general contractor and a surety.

Unless a case on appeal is remanded for a new trial on another basis or a summary judgment is entered on the issue without regard to the factual nature, it would be improper to provide a party with "another bite of the apple" by allowing him another opportunity to prove a missing element of his case, be it damages, existence of a contract or note, fact of negligence, or any other essential part of his claim. Bank did not carry its burden of proof on this issue at the trial.

Accordingly, we conclude that the allowance of $2,500.00 to bank as attorney fees was error.

Reversed and remanded for entry of judgment in accordance with this opinion.