236 So.2d 57 (1970)
Edward Fillmore DARNELL, Plaintiff-Appellant,
v.
Leary TAYLOR et al., Defendants-Appellees.
No. 3087.
Court of Appeal of Louisiana, Third Circuit.
May 27, 1970.
Rehearing Denied June 16, 1970.
*58 Gahagan & Kelly, by Russell E. Gahagan, Natchitoches, for plaintiff-appellant.
Peyton Cunningham, Sr., Natchitoches, for defendant-appellee.
Makar & Whitekar, by John Makar, Natchitoches, for defendant-appellee.
Before TATE, HOOD and MILLER, JJ.
HOOD, Judge.
This is an action instituted by Edward Fillmore Darnell to recover losses sustained by him because of leakage from a gasoline tank on premises which plaintiff had subleased from Leary Taylor. The defendants are Taylor and American Oil Company, the latter being the owner and original lessor of the property. Taylor reconvened for damages against Darnell, and American Oil Company filed a third-party action against Taylor. Judgment on the merits was rendered by the trial court dismissing plaintiff's suit and rejecting Taylor's reconventional demand. Plaintiff has appealed.
This suit was before us originally on appeal from a summary judgment rendered by the trial court on September 20, 1967, dismissing the suit. We reversed that judgment and remanded the case for trial. See Darnell v. Taylor, 209 So.2d 316 (La. App. 3 Cir., 1968). The suit was then tried and judgment on the merits was rendered by the trial court on December 31, 1969. The appeal which is before us now was taken from that judgment.
The principal issues presented are: (1) Is either defendant liable to plaintiff under LSA-C.C. Art. 2695 for losses which the latter sustained due to leakage from the gasoline storage tank? (2) Is plaintiff barred from recovering all or a part of the amount claimed because of his failure to minimize his losses? and (3) Is American Oil entitled to recover from Taylor any amount which the former might be condemned to pay to plaintiff?
The facts are that in 1956, Pan American Southern Corporation leased a service station owned by it in Natchitoches, Louisiana, to defendant Taylor. On the same day, Pan American also entered into an "Equipment Loan Agreement" with Taylor, under the terms of which it loaned to the latter some service station equipment, including three underground gasoline storage tanks located on the leased premises. One of the tanks had a capacity of 1,000 gallons, and each of the other two had a capacity of 550 gallons. The lease provided for a primary term of twelve months beginning on January 1, 1957, but it has been renewed from time to time since that date, and it and the loan agreement were still in effect at the time of the trial.
On July 1, 1960, Taylor, by oral agreement, subrented or subleased to Darnell the above mentioned service station, including the gasoline storage tanks and other equipment. The sublease was on a month-to-month basis, the agreement being that Taylor was to receive a cash rental of $200.00 per month, and Darnell was to retail only the petroleum products which Taylor handled. *59 This month-to-month sublease remained in effect from July 1, 1960, until it was terminated on July 1, 1966. Darnell operated a service station on the leased premises during that entire period of time.
While Darnell was getting his records together in the spring of 1966, to prepare his 1965 income tax return, he discovered that his profits during that year were less than they had been in previous years. After investigating, he concluded that one of the three underground storage tanks at the service station was leaking gasoline.
On or about March 30, 1966, after arriving at that conclusion, Darnell orally advised Taylor that he thought one of the tanks was leaking. This was the first time that Taylor or Pan American had ever been notified that plaintiff was losing gasoline or that there might be a defect in the tank. Taylor and a representative of Pan American immediately checked the tanks, and discovered that one of them, a 550-gallon tank, leaked 28 gallons of gasoline during a twelve-hour period. This check was made by measuring the amount of gasoline in each tank at the close of business on March 30, and measuring each such tank again before any withdrawals were made. from it the next morning. These measurements were made by using a stick gauge in each tank, that being the same method of measuring which Darnell customarily had used daily while he operated the station. On March 31, 1966, which was the day after Darnell first reported that he was losing gasoline, Taylor transferred all of the remaining gasoline in that 550-gallon tank to one of the other storage tanks on the leased premises, and Pan American promptly replaced the defective tank with a new one. When the old tank was pulled out of the ground the parties discovered that there was a small hole in it.
Plaintiff contended originally that a total of 19,899 gallons of gasoline had leaked out of that tank between June 1, 1965, and March 31, 1966, and that that quantity of gasoline had cost him $5,153.84. He instituted suit for that amount against Taylor and Pan American contending primarily that Taylor is liable and alternatively that he is entitled to recover from Pan American. At the trial, Darnell acknowledged a mathematical error in his calculations, and he reduced his claim to the loss of 19,727 gallons of gasoline, valued at $5,109.29.
Pan American Southern Corporation was later merged with American Oil Company. The last named company answered the suit, and it voluntarily substituted itself as a party defendant in place of Pan American.
During the trial defendant Taylor tendered to plaintiff a sum of money sufficient to cover all court costs up to the date of tender, and in addition thereto he tendered to Darnell the cost of 150 gallons of gasoline, the latter being the approximate amount of gasoline which defendant felt plaintiff might have lost before he should have reported the condition and taken some steps to minimize the loss.
Plaintiff bases his claim on Articles 2693 and 2695 of the Louisiana Civil Code. Article 2693 provides, in part, that "The lessor is bound to deliver the thing in good condition, and free from any repairs." Article 2695 provides:
"The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."
The loss of gasoline which plaintiff sustained in this case was due to a vice or defect on one of the tanks which was included as a part of the leased premises. The defect, or hole, in the tank developed or arose after the lease was made, and it *60 did not arise from the fault of the lessee. Under those circumstances, we think the lessor is bound to indemnify the lessee, Darnell, for the loss he sustained as a result of that vice or defect. LSA-C.C. Art. 2695; Machen v. Gulf Oil Corporation, 184 So.2d 550 (La.App. 2 Cir., 1966).
Defendants contend, however, that plaintiff is barred from recovering the losses which he sustained during the ten-month period from June 1, 1965, to March 31, 1966, because he failed to exercise reasonable care in attempting to avoid or to minimize his losses. They take the position that plaintiff knew or should have known that the tank was leaking during the entire ten-month period, that defendants had no way of knowing that there was a defect in the tank, and that plaintiff could have avoided or greatly minimized his loss by simply notifying defendants of the leakage and by not using that particular tank until such notice was given. They argue that defendants are not liable to plaintiff for the losses which could have been avoided by the exercise of reasonable care and prudence by Darnell.
The trial judge found that plaintiff had failed to exercise reasonable care in discovering and reporting the leakage of gasoline, and that he thus failed to act as a reasonable and prudent operator in attempting to minimize his loss. He rendered judgment rejecting all of plaintiff's demands.
Plaintiff testified that during the entire time he operated this service station he checked the gasoline in each of the storage tanks daily, and that he kept accurate records as to the number of gallons of gasoline which were put into each tank and the number which were withdrawn from it every day. Each tank was checked with a "stick gauge" every morning when the station was opened for business, and the number of gallons found in each tank at that time was recorded. The distributor, Taylor, delivered gasoline to the station every day, and on each delivery he furnished Darnell with an invoice showing the exact number of gallons which he had put into the tanks that day. All of these invoices were kept by plaintiff. Then, between 4:00 and 5:00 o'clock every afternoon Darnell checked the meter on every gasoline pump to determine how much gasoline had been pumped out of each tank since the meter reading the day before. These meter readings were recorded in two separate places, one of them being in a special record book with plaintiff kept for that purpose, and the other being on the tapes which he took from his cash register every day. The stick gauge tests which he made daily, therefore, showed the number of gallons of gasoline in each storage tank every morning. The invoices showed the quantity of gasoline which was put into the tanks during the day, and the meter readings taken every afternoon showed the amount of gasoline which had been withdrawn from each tank during the past 24 hours.
We agree with the trial judge that Darnell, by simply referring to his records, could have determined easily on any day during that ten-month period whether gasoline was escaping from any of the three storage tanks by means other than through his gasoline pumps. Plaintiff's own allegations and his testimony supports this conclusion. He alleged and testified, for instance, that by these same records he is able to establish the exact number of gallons of gasoline which leaked from one particular tank during a specific ten-month period. Taylor, by using the same measuring devices and technique which Darnell had used, was able to determine that the tank was leaking within a period of less than one day after the loss of gasoline was reported to him, and that further supports the trial judge's conclusions.
Plaintiff alleges that according to his records he lost 19,727 gallons of gasoline over a period of 303 days. This is an average loss of 65 gallons per day during that time. He thus lost 550 gallons of gasoline, the maximum capacity of the entire *61 tank, every eight and one-half days. That amounts to 23 percent of all of the regular gasoline he purchased during the entire ten-month period. Computed at a cost of 25.9 cents per gallon, as plaintiff does, it amounts to a net loss of $16.84 per day, or a loss of more than $500.00 per month. Darnell acknowledges that he had no reason to suspect that there was a leak in the tank prior to June 1, 1965, so we assume that his profits held up until that time and that they began decreasing sharply about that date. We do not believe that a reasonably prudent service station operator, who keeps accurate daily records of his purchases and sales and who exercises reasonable care, would overlook such a sudden and substantial loss of profits for a period of ten months. This is especially true when we consider that with only a few exceptions plaintiff personally gauged his storage tanks and the meter gauges on the gasoline pumps every day, and he made most of the entries on his records. He thus was thoroughly familiar with the records which showed that substantially more gasoline was being put into the defective tank than was being withdrawn from it, and he had to handle those records every day.
The evidence shows that plaintiff stored regular gasoline in the 1,000-gallon tank and also in the 550-gallon tank which eventually developed the leak. When deliveries were made to the station, the invoices specified the number of gallons of regular gasoline which were delivered, but they did not show the quantity which was put into each of these two tanks. Plaintiff argues, therefore, that "there was no way he could have discovered the loss." There is no merit to that argument. The stick gauge tests he made and the meter readings from the pump which drew solely from the defective tank would have showed clearly that the 550-gallon tank was leaking. Also, the invoices and the meter readings would have shown that gasoline was leaking from either that tank or from the 1,000-gallon tank, and the defective one could have been located quickly if plaintiff had reported his losses promptly.
The doctrine of mitigation of damages applies in this state. Unverzagt v. Young Builders, Inc., 252 La. 1091, 215 So.2d 823 (1968). This doctrine, sometimes called the doctrine of avoidable consequences, imposes on the injured person a duty to exercise reasonable diligence and ordinary care in attempting to minimize his damages after the injury has been inflicted. The care and diligence required of him is the same as that which would be used by a man of ordinary prudence under like circumstances. He need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize the damages, but his efforts to minimize them must be reasonable and according to the rules of common sense, good faith and fair dealing. LSA-C.C. Art. 2323; Unverzagt v. Young Builders, Inc., supra; Pelloquin v. Missouri Pacific Railroad Company, 216 So.2d 686 (La.App. 3 Cir., 1969). Keating v. Boyce Machinery Corp., 196 So.2d 623 (La.App. 1 Cir., 1967); Alex W. Rothschild & Co. v. Lynch, (171 La. 114, 129 So. 725, 1930).
In the instant suit the evidence shows that plaintiff Darnell had the information available to him at all times after June 1, 1965, that gasoline was escaping from one of the storage tanks. As a reasonably prudent service station operator, we think plaintiff should have noticed this soon after the leakage started. If he had done so and had reported that condition to his lessor, the further loss of gasoline would have been avoided. We conclude that plaintiff failed to exercise reasonable care in attempting to minimize his loss after a defect in the tank arose, and that he is not entitled to recover the losses which he sustained after the defect should have been discovered by him and corrected.
The evidence does not show how long it should have taken Darnell to discover and report the defect. Taylor determined that the tank was leaking within a few hours *62 after the irregularity in plaintiff's records was reported to him, and he immediately took action which prevented any further leakage. Only 28 gallons of gasoline were lost after the matter was called to Taylor's attention. This indicates that plaintiff, as an experienced operator of a service station, should have discovered the leak within the same period of time and with about the same loss if he had exercised reasonable care. We realize, of course, that some loss would occur before plaintiff could have detected an irregularity in his records and before he could take steps to avoid further loss.
We believe that a period of ten days from and after the leakage began was adequate for plaintiff to have discovered and reported the defect or vice in the tank. If that had been done all further leakage would have been stopped. Computed at the alleged rate of 65 gallons per day, and 25.9 cents per gallon, this means that plaintiff reasonably could have lost 650 gallons of gasoline before any further loss was stopped. That quantity of gasoline had a value of $168.35, and we find that plaintiff is entitled to recover that amount.
We are aware of the fact that in Machen v. Gulf Oil Corporation, supra, the plaintiffs-lessees were awarded a substantial sum of money representing the value of gasoline lost from leakage over a long period of time. In that case, however, the evidence showed that the lessees had "made many complaints and requests (to the distributor) for inspections of the equipment and for corrections to eliminate the losses which they were sustaining," that the distributor had promptly notified the owner of the station, and that the owner had failed to discover the leak until many months later. The plaintiffs, therefore, had exercised reasonable care in an effort to minimize their losses. In the instant suit, unlike the facts in Machen, the lessee or operator of the station did not notify anyone of the losses until about ten months after he should have known about them. When he did notify his lessor, Taylor, of such losses the vice or defect in the tank was repaired immediately, and action was taken by the lessor to prevent any further appreciable loss. We thus distinguish the instant case from Machen.
When this case was before us originally we noted that in the written lease from American Oil to Taylor, executed in 1956, Taylor obligated himself to keep the premises in good repair. And, in the Equipment Loan Agreement executed simultaneously with that lease Taylor agreed to hold American Oil harmless "from any and all liability for damages which may be suffered by him or others by reason of leakage, fire, explosion or other casualty occurring through any imperfection in said equipment or the appliances connected therewith or from any other cause whatsoever." We concluded that in view of those facts and the holding in Machen v. Gulf Oil Corporation, supra, the hold harmless agreement applied to imperfections arising after the commencement of the lease, but that it did not apply to inherent structural vices. We remanded the case for a factual determination as to whether the leak in the tank resulted from a structural vice which existed at the time the lease was executed. (209 So.2d 316, 319).
The evidence convinces us that the leak in the gasoline storage tank resulted from rust, corrosion or electrolysis. It did not develop until 1965, long after the commencement of the lease, and it was not caused by any inherent structural vice. Our conclusion, therefore, is that the hold harmless agreement applies, and that American Oil is not liable for the losses sustained by plaintiff. See LSA-R.S. 9:3221; Meyers v. Drewes, 196 So.2d 607 (La.App. 4 Cir., 1967); Machen v. Gulf Oil Corporation, supra.
For the reasons herein set out, the judgment appealed from is reversed, and judgment is hereby rendered in favor of plaintiff, Edward Fillmore Darnell, and against *63 defendant, Leary Taylor, for the sum of $168.35, with legal interest thereon from date of judicial demand until paid. The reconventional demands of Leary Taylor and the third-party demands of American Oil Company are rejected. One-half the costs incurred in both the trial court and on appeal are assessed to plaintiff Darnell, and the remaining one-half of said costs are assessed to defendant Taylor.
Reversed and rendered.