**UNC TETON EXPLORATION DRILLING, INC., a Wyoming corporation, Appellant (Defendant),**

v.

**Karen D. PEYTON, Mary D. Yokum, and E.O. Ristau, Appellees (Plaintiffs).**

**No. 88–97.**

Supreme Court of Wyoming.

May 12, 1989.

---

J. Kenneth Barbe of Brown & Drew, Casper, for appellant.

Donald E. Chapin and Charles S. Chapin of Crowell and Chapin, P.C., Casper, for appellees.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

URBIGKIT, Justice.

This is a Casper oil industry retrenchment employee termination case.[1]  Three

---

1.  See also *NL Industries, Inc. v. Dill,* 769 P.2d 920 (Wyo.1989).

office management personnel, Karen D. Peyton, Mary D. Yokum and E.O. Ristau (employees), successfully sued their employer, UNC Teton Exploration Drilling, Inc. (UNC Teton), for post-discharge salary continuation benefits. UNC Teton appeals from this judgment. We affirm the judgment with modifications and partially remand. We award appellate attorney's fees to employees.

## I. ISSUES

Five issues are presented: (1) Effect, if applicable, of the preemptive provision[2] of the Federal Employment Retirement Income Security Act. Is this an Employee Retirement Income Security Act (ERISA) case? (2) Sufficiency of the evidence under whatever rules of law are applicable to prove an agreement from which liability flows—sufficiency of the evidence to prove violated contractual right. (3) Reversible error in limiting cross-examination of one employee—cross-examination limitation. (4) Offset of other income received after termination which would serve to reduce the damage award—measure of damages or duty to mitigate. (5) Sufficiency of employees' proof of attorney's fees and incurred costs—awarded litigation costs.

## II. FACTS

The three employees who were plaintiffs included Ristau, assistant to the president, Yokum, secretary to the president, and Peyton, manager of the land department. The defendant, UNC Teton, is a Wyoming corporation constituting a wholly-owned subsidiary of UNC Resources which, in ear-

lier days, was a major participant in national and international energy development.

In the 1984 corporate retrenchment ending in employee discharge, question arises as to the availability of a salary continuation benefit program for these employees. The one time existence of such benefits as policies for both UNC Teton, the employer subsidiary, and UNC Resources, the parent corporation, was not an issue.[3] What came to be centralized for factual analysis at trial was whether the benefit program rights of any kind had been effectively rescinded before employees' employment termination. Prior to 1983, both UNC Teton and UNC Resources had employee policy and procedure manuals. Each manual contained a similar longevity based termination benefit provision. In 1983, company officials discussed discontinuance of the benefit. On September 13, 1983, a memorandum was prepared and circulated within the organization announcing:

> Effective immediately, the UNC Human Resources Policy Manual will no longer be applicable to UNC Teton Exploration Drilling, Inc. operations or employees. UNC Teton's personnel manual will be the governing policy. This manual is currently under review.

> All personnel policy questions will be reviewed by me [Hall, personnel manager] and directed to K.A. Cunningham II [company president] for final recommendations and/or approval.

This communication became known as the "Exhibit 4 memorandum."

---

**2.** 29 U.S.C. § 1144(a).

**3.** The provisions were contained in the UNC Teton Human Resources Policy and Procedure Employee Manual in a section designated "Reduction in Force (Layoff)." Time of eligibility was determined by years of service and the manual provisions then stated:

> Salary continuation begins after all earned vacation is used. Vacation does not accrue during the period of salary continuation. Further, salary continuance is reduced by disability payments from any source (Social Security, Workers' Compensation, etc.) Salary continuance will cease at the earliest of the following occurrences [sic]: completion in ac-

cordance with the foregoing schedule or when the person on layoff either becomes employed or collects Unemployment Compensation, whichever occurs first.

This program is broadly characterized in ERISA terminology as an unfunded welfare benefit plan for wage continuation protection upon employment termination. See *California Hosp. Ass'n v. Henning*, 770 F.2d 856 (9th Cir.1985), opinion amended and reh'g denied 783 F.2d 946 (9th Cir.1986) and *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140 (4th Cir.1985), aff'd 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559, cert. denied 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

By the summer of 1984, the work force of UNC Teton had been reduced to very few people and personnel manager R. Dan Hall commenced working on changes to the company policy and procedure manual, specifically the termination pay provisions. Apparently made under authorization of president Keith A. Cunningham, II, the policy statement was edited, approved and signed by Hall. Thereafter, the document disappeared and UNC Teton contends that this 1984 draft version was never put into effect.

After employees' discharge in late 1984, UNC Teton denied wage continuation benefits by assertion that all entitlement had been abolished in 1983. Suit was instituted on April 9, 1985 alleging continued entitlement under the UNC Teton policy manual. The case proceeded as a normalized employee handbook contract action in the Seventh Judicial District Court, Natrona County, Wyoming. The factual conflicts addressed benefit rescission before employment termination as *Leithead v. American Colloid Co.*, 721 P.2d 1059 (Wyo.1986) and *Armstrong v. American Colloid Co.*, 721 P.2d 1069 (Wyo.1986) inquiries. However, by motion on January 27, 1988 and trial brief the following day, UNC Teton raised the preemptory umbrella of ERISA. 29 U.S.C. §§ 1002 to 1461. The motion to dismiss presented the failure to state a claim and lack of subject matter jurisdiction resulting from the preemptive function of ERISA under which employees had not separately made claim. It is not shown in the record, but we are advised in briefs, that the trial court held a hearing on the motion to dismiss and elected to proceed through trial, and concluding that if ERISA controlled, its law would be applied in the final decision. See *Evans v. Bexley*, 750 F.2d 1498 (11th Cir.1985), defining that any question which has been presented to the trial court for a ruling and not thereafter waived or withdrawn is preserved for review. Cf. *Hagler v. J.F. Jelenko & Co.*, 719 S.W.2d 486 (Mo.App.1986), where ERISA was not pleaded. The trial court, both in decision letter and resulting favorable judgment to employees, which includ-

ed attorney's fee award pursuant to 29 U.S.C. § 1132(g), enunciated that recovery was controlled by the federal act:

> This action is governed by the Federal Employee Retirement Income Security Program, however, said federal act does not benefit the Defendant because it never terminated the severance pay benefit made subject of this action.

Within the broadly defined issues of the existence and effect of ERISA preemption, sufficiency of the evidence, denied cross-examination concerning benefit rescission, application of mitigation to recovery and adequacy of proof of attorney's fees, we generally affirm the trial court decision, except reverse on the other income credit being added to the award and remand for proof of costs and attorney's fees. Employees will also be granted appellate attorney's fees pursuant to 29 U.S.C. § 1132(g) if requested before a mandate issues from this court by proper request supported by itemized detail. *Sokol v. Bernstein*, 812 F.2d 559 (9th Cir.1987); *Bittner v. Sadoff & Rudoy Industries*, 728 F.2d 820 (7th Cir.1984).

## III. PREEMPTION BY ERISA

This subject is one of first impression for this court, although not without a national litigative history including seven decisions of the United States Supreme Court for 1987 to date: *Firestone Tire and Rubber Co. v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Mackey v. Lanier Collections Agency & Service, Inc.*, —— U.S. ——, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); *Laborers Health and Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988); *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); and *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S.

272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987).[4]

This case, in pleading context, was unusual since the ERISA issue was presented for the first time just before trial. Its status here remains similarly confused. UNC Teton asks us to agree with the trial court that the federal law with its preemptive character applies. Employees, in defending the judgment, attack the basis upon which the judgment was entered by the trial court. Nothing of record or argument reveals that UNC Teton ever considered its wage continuation benefit policy to be within ERISA requirements. Also, nothing shows any federal law compliance by UNC Teton in pursuing filings or notices. If ERISA does not apply, attorney's fees cannot be awarded since either a statute or an agreement is required to award attorney's fees in this jurisdiction. *NL Industries, Inc. v. Dill,* 769 P.2d 920 (Wyo. 1989); *Bowers Welding and Hotshot, Inc. v. Bromley,* 699 P.2d 299 (Wyo.1985); *Coulter v. City of Rawlins,* 662 P.2d 888 (Wyo.1983). In this case, there is no entitling agreement provision.

The law is settled that wage continuation benefits upon discharge are an ERISA benefit. *Scott v. Gulf Oil Corp.,* 754 F.2d 1499 (9th Cir.1985). Furthermore, we discern no difference in issue analysis since the factual question remains as to whether the program was discontinued in 1983 or continued to the date of employees' discharge in 1984. Existence of the right to benefits, if not earlier rescinded, is consequently subject to our analysis and decision in *Leithead,* 721 P.2d 1059. See also *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) and *Cain v. Allen Elec. & Equipment Co.,* 346 Mich. 568, 78 N.W.2d 296 (1956), consideration of contractual rights engendered by employee handbook related to broader review of tort liability.

Although we have reviewed many authorities, including more than fifty-five ci-

tations by the litigants, the preemption ERISA issue is most appropriately addressed as the law of the case. UNC Teton asked that ERISA be applied to this case, and the trial court did just that. By this resolution of both preemption and entitlement theory application, this court will not consider the issues carefully briefed and assiduously argued by employees relating to the failure of UNC Teton to appreciably comply with any aspect of ERISA. See *Blau v. Del Monte Corp.,* 748 F.2d 1348 (9th Cir.1984), cert. denied 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). Cf. *Adcock v. Firestone Tire and Rubber Co.,* 822 F.2d 623 (6th Cir.1987). Neither are we faced with the statutory benefit exception as engrafted upon the general principles of preemption. *Fort Halifax Packing Co., Inc.,* 482 U.S. 1, 107 S.Ct. 2211; *Martori Bros. Distributors v. James–Massengale,* 781 F.2d 1349, amended 791 F.2d 799 (9th Cir.), cert. denied 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 385, cert. denied 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986); *Teper v. Park West Galleries, Inc.,* 431 Mich. 202, 427 N.W.2d 535 (1988) (reh'g denied 10/26/88). Cf. *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981).

For this appeal, we will consider that ERISA applies and preemption exists as the law of the case since the position taken by the trial court is the same as presented here on appeal by UNC Teton. *Weisbrod v. Ely,* 767 P.2d 171 (Wyo.1989); *Kaler v. Puget Sound Bridge & Dredging Co.,* 72 Wash. 497, 130 P. 894 (1913). See also *Gifford–Hill–Western, Inc. v. Anderson,* 496 P.2d 501 (Wyo.1972) in analysis of the law of the case.

## IV. SUFFICIENCY OF THE EVIDENCE

In a singular number of ERISA decisions, the validity of the plan administra-

---

**4.** Federal District Judge Richey in *Schultz v. National Coalition of Hispanic Mental Health and Human Services Organizations,* 678 F.Supp. 936, 938 (D.D.C.1988) related:

Courts have decided nearly 100 cases about the reach of the ERISA preemption clause since the Supreme Court issued the Pilot Life and Metropolitan Life v. Taylor decisions.

Since that February 1988 decision, the volume of litigation has not ended. West search service for all reporters–1988–ERISA produces 1,323 federal court entries and 716 state court entries.

tor's act is to be tested by the arbitrary and capricious standard. *Adcock,* 822 F.2d 623; *Cook v. Pension Plan for Salaried Employees of Cyclops Corp.,* 801 F.2d 865 (6th Cir.1986); *Jung v. FMC Corp.,* 755 F.2d 708 (9th Cir.1985); *Rhoton v. Central States, Southeast and Southwest Areas Pension Fund,* 717 F.2d 988 (6th Cir.1983). See also Comment, *The Arbitrary and Capricious Standard Under ERISA: Its Origins and Application,* 23 Duq.L.Rev. 1033, 1037–39 (1985) and Note, *Judicial Review of Fiduciary Claim Denials Under ERISA: An Alternative to the Arbitrary and Capricious Test,* 71 Cornell L.Rev. 986, 994 n. 40 (1986).

Whatever confusion the subject may have previously engendered, the applicable standard for ERISA review is now firmly established by the United States Supreme Court in *Firestone Tire and Rubber Co.,* 109 S.Ct. 948. Justice O'Connor, writing for the unanimous court, applied a de novo standard from trust law.

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue. Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Because we do not rest our decision on the concern for impartiality that guided the Court of Appeals, see [*Bruch v. Firestone Tire and Rubber Co.*] 828 F.2d [134] at 143–146 [ (3d Cir.1987) ] we need not distinguish between types of plans or focus on the motivations of plan administrators and fiduciaries. Thus, for purposes of actions under § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest.

Id. at 956 (emphasis in original).

The court held that "[t]he trust law de novo standard of review is consistent with the judicial interpretation of employee benefit plans prior to the enactment of ERISA." Id. at 955. The court further commented that otherwise "ERISA would require us to impose a standard of review that would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." Id. at 956.

With this standard in mind, attention turns to a sufficiency of the evidence analysis. UNC Teton, as employer, argues reliance not only on the Exhibit 4 memorandum but also on the 1983 oral discussions which occurred and continued through the rewriting process in 1984. Consequently, this court considers the decision of the trial court as it analyzed the Exhibit 4 memorandum and its effect and then made evidentiary rulings on discussions from which the memorandum resulted. *Leithead,* 721 P.2d 1059; *Brooks v. Carolina Tel. & Tel. Co.,* 56 N.C.App. 801, 290 S.E.2d 370 (1982); *Langdon v. Saga Corp.,* 569 P.2d 524 (Okl. App.1976). We apply the normal appellate rule that where there is sufficient evidence to support the factual deliberation of the trial court, as there is to be found here, this court "will not invade the province of the trier of fact by reaching a different conclusion." *Duncan v. Laramie County Community College,* 768 P.2d 593, 596 (Wyo. 1989). For appellate review, "the evidence of the prevailing party [is accepted] as true, leaving out entirely the evidence presented in conflict therewith, giving every favorable inference which may be fairly and reasonably drawn from the prevailing party's evidence." *Weisbrod,* 767 P.2d at 177.

■ Factually, litigants agree that prior to the preparation and publication of the Exhibit 4 memorandum, both UNC Resources, as parent, and UNC Teton, in its separate employee handbook, had similar wage continuation programs. The dispositive question is whether the trial court was required to conclude that the Exhibit 4 memorandum constituted not only a rescission of UNC Resources benefit pro-

gram but also constituted a rescission of rights provided by the actual employer, UNC Teton. Strangely enough, no other relevant documentary evidence was produced at trial such as corporate resolutions, notices to employees or otherwise which provided support for UNC Teton's thesis of termination of its handbook benefits.

We find a factual basis for the trial court's decision that the memorandum fairly and simplistically not only did not terminate the benefits of UNC Teton as interpreted but essentially provided evidentiary suggestion that those benefits would be continued until further action was taken by actual rescission. A corporation conducts business, which is normally authenticated by memoranda, resolutions or decisions in writing, through the activities of its officers and directors. The failure of UNC Teton to provide any additional written document of termination similar to the Exhibit 4 memorandum of UNC Resources affords reasoned justification for the trial court decision. *Hinkeldey v. Cities Service Oil Co.*, 470 S.W.2d 494 (Mo.1971). Our analysis is not altered by the events of 1984 which addressed the controversy of whether an amended policy was actually adopted or not. Those drafting activities were certainly consistent with a status of non-rescission during the prior year. An oral rescission of a written policy does not suffice.

For these reasons, we hold that the trial court decision was not erroneous in its assessment that the Exhibit 4 memorandum was entitled to appropriate evidentiary weight. We also concur that the document was not ambiguous and determined what was done (and not done) to discontinue benefits. Consequently, we hold, as did the trial court, that employees could rely on the UNC Teton policy manual for continued entitlement to date of discharge.

## V. LIMITATION OF CROSS–EXAMINATION OF RISTAU

■ The fact is peripherally established in this record that employees were not the first former company employees to file suit to seek wage continuation benefit recovery. In at least one prior case, present appellee Ristau had signed an affidavit.[5] That affidavit, filed in an earlier state court proceeding in Natrona County, involved employee claimant Joe Prendergast and partially stated:

4. During or about June 1981, Defendant adopted several personnel policies from its parent corporation. Among those policies was a salary continuation plan for laid-off employees. Plaintiff did not "bargain-for" or have anything whatsoever to do with adoption of the salary continuation policy. That policy, as well as all others adopted from the parent corporation as described above, were rescinded by Defendant effective September 13, 1983, and a memorandum to that effect was issued by Defendant notifying all employees about that decision.

5. No employee laid-off by Defendant since September 13, 1983 has received

---

5. His statement in the affidavit and examination at trial considered the effect of the Exhibit 4 memorandum and whether it extended beyond its clear language to also rescind the UNC Teton program. As that issue was clearly defined in testimony presented to the trial court, Ristau asserted that the memorandum only rescinded the benefit provisions of the parent, UNC Resources. Cross-examination was directed to the unexpressed intention of officers to rescind all benefits. In speaking of the Exhibit 4 memorandum, Ristau testified: .

Q. Okay, and after that exhibit was—I am sorry—after that memorandum was posted UNC Teton no longer followed any termianation [sic] pay policy, did it?

A. I don't think we had any need for it until they started closing.

Q. To your knowledge though UNC Teton didn't have a termination policy after that date, did it?

A. It did in their manual.

In further cross-examination inquiry, questions concerned what he said in a deposition:

Q. Your answer to my knowledge, no, sometime during that period there were revisions to the UNC manual, implemented sometime in 1984. Answer: That's right.

A. May I say something? In another place in this desposition [sic] it asks the same thing, and I referred to the fact that the memo didn't take out of effect the UNC Teton manual, it was to be reviewed.

salary continuation payments under that salary continuation policy.

Ristau's statements within the affidavit, as well as inquiry in deposition, were addressed by UNC Teton in attempted cross-examination to support its thesis that the Exhibit 4 memorandum rescinded not only the UNC Resources wage continuation benefits, but any similar rights included for employees of UNC Teton by its own handbook provisions. We agree with UNC Teton that the restrictions on cross-examination of a party under these circumstances was in error; but, in total review of the record presented, find the error to have been harmless. *Herman v. Speed King Mfg. Co.*, 675 P.2d 1271 (Wyo.1984); *ABC Builders, Inc. v. Phillips*, 632 P.2d 925 (Wyo.1981); *Albrecht v. United States*, 831 F.2d 196 (10th Cir.1987). The Exhibit 4 memorandum was not a bilaterally negotiated agreement; it was a statement by the employer of what would be withdrawn in its benefit agreement with its employees. Consequently, the citations of authority by UNC Teton, including *Hibbett Sporting Goods v. Biernbaum*, 375 So.2d 431 (Ala. 1979), are inapposite. Here, the generic axiom that "what it is, is what you see" may be most persuasive. To rescind, the employer could have specifically and succinctly said so. Any impeachment or further restatements by Ristau would not alter the facts. A written recision did not exist and any oral recision was in evidentiary dispute.

## VI. REDUCTION OR MITIGATION OF RECOVERY FOR UNEMPLOYMENT COMPENSATION AND RE–EMPLOYMENT INCOME

UNC Teton claims Ristau received unemployment compensation for five weeks which would require a reduction of recovery of $915 to him, Peyton was re-employed at a reduced salary requiring a reduction for the amount she should be awarded, and Yokum received both disability benefits and unemployment compensation which also would require a reduced total for the wage continuation award. UNC Teton contends that the proper damage analysis within the contractual provisions will not permit an award of a greater recovery than would have been the case with regularly paid benefits in the same circumstances. Employees conversely argue that assessment of any mitigative offset is foreclosed by UNC Teton's breach of the agreement. This argument is premised on the right of choice of the discharged employee to forego re-employment or receipt of collateral benefits, such as unemployment compensation, in order to continue to receive the wage continuation payment. Technically speaking, the issue is not a classical question of violation of the duty to mitigate, but rather whether the conduct which produced substitute income offsets the judgment when the employer denied existence of the benefit entirely.

The premise adopted by employees to justify the greater award is that equitable estoppel should allow retention of more than the benefit of the bargain. Although we do not necessarily determine that there was an actual duty to mitigate by seeking other employment or accepting unemployment compensation benefits, we cannot agree that equitable estoppel prevents offset to reduce the recovery to the amount of actual loss sustained. In this construction, the estoppel thesis of *Bauer v. State ex rel. Wyoming Worker's Compensation Div.*, 695 P.2d 1048 (Wyo.1985) and *Roth v. First Sec. Bank of Rock Springs, Wyo.*, 684 P.2d 93 (Wyo.1984) do not apply. At issue is the measure of damages resulting from the denial of a contractual benefit. If the benefit had been regularly paid, reduction for these factors was specifically required by the terms of the policy and procedure detail:

> [S]alary continuance is reduced by disability payments from any source (Social Security, Workers' Compensation, etc.) Salary continuance will cease at the earliest of the following occurrances [sic]: completion in accordance with the foregoing schedule or when the person on layoff either becomes employed or collects Unemployment Compensation, whichever occurs first.

Benefits received from disability, unemployment compensation and succeeding em-

ployment should be credited for liability reduction.

█ The apparent concept developed by the trial court in its judgment and award of damages was that the breach of contract as a denial of payment extinguished the employer's right to offset or credit which otherwise would have existed. We do not agree. It is our conclusion that the benefit portfolio constituted a substitute for employment or other subsequently received income and that the maximum which should be included in the judgment is the maximum which the policy provided. Consequently, the judgment now awarding the unreduced amount is in error to the extent that succeeding employment or receipt of unemployment compensation benefits would have reduced liability under the benefit program. Upon remand, the trial court should credit UNC Teton with any amounts received by the employees which would have reduced eligibility under the criteria of the written UNC Teton benefit provision.

The dispositive consideration is not, technically speaking, mitigation in the sense of failure to take action to reduce damages:

> Doctrine of "mitigation of damages," sometimes called doctrine of avoidable consequences, imposes on injured party duty to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted and care and diligence required of him is the same as that which would be used by man of ordinary prudence under like circumstances. *Darnell v. Taylor*, La. App., 236 So.2d 57, 61 [ (1970) ]. Mitigation of damages is an affirmative defense and applies when plaintiff fails to take reasonable actions that would tend to mitigate his injuries.

Black's Law Dictionary 904 (5th ed. 1979).

█ The rule which we enunciate for damage assessment under the contract is an amount which constitutes actual loss. To permit recovery for ineligible time without reduction for amounts received expands recovery beyond the contractual provision. It is a fundamental principle of damage assessment that a person injured

shall only receive compensation for his loss and no more. *Willmschen v. Meeker*, 750 P.2d 669 (Wyo.1988). The purpose of damages is to put injured parties in the same position they would have been but for the breach. *Reynolds v. Tice*, 595 P.2d 1318 (Wyo.1979). "The general measure of damages for breach of contract is the amount which will compensate the injured person for the loss which full performance of the contract would have prevented or the breach of it has entailed." *Zitterkopf v. Roussalis*, 546 P.2d 436, 438 (Wyo.1976). No detriment to employees in re-employment or application for unemployment compensation is shown and, consequently, utilization of estoppel to permit dual recovery is inappropriate. See *Adcock*, 822 F.2d at 626 n. 8, which lists cases requiring or not requiring unemployment for wage continuation benefit entitlement, and *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140 (4th Cir.1985), aff'd 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559, cert. denied 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

## VII. COSTS AND ATTORNEY'S FEES

### A. Costs.

UNC Teton contends that the proof to award attorney's fees was inadequate under our standards and that no justification for the requested costs was documented. We agree. Costs are allowable after itemization and with a right for contest and hearing. Nothing in this record would advise us or inform the trial court how the actual computation of $1,178.39 was made. Upon remand, employees should itemize and UNC Teton is to be provided a right to object. See *Hashimoto v. Marathon Pipe Line Co.*, 767 P.2d 158 (Wyo.1989). Costs must be itemized and proven as reasonable. *O's Gold Seed Co. v. United Agri-Products Financial Services, Inc.*, 761 P.2d 673 (Wyo.1988); *Bi-Rite Package, Inc. v. District Court of Ninth Judicial Dist. of Fremont County*, 735 P.2d 709 (Wyo.1987).

█ The amount of costs as a client's billing for "disbursements" which is additionally not itemized in the billing of account exhibit does not suffice. What ex-

penses the law firm or the litigant may incur in the process of his lawsuit is clearly not necessarily the same as what the court should award as costs. *Kaess v. State,* 748 P.2d 698 (Wyo.1987).

### B. Attorney's Fees.

The trial court, in application of the statutory authorization of 29 U.S.C. § 1132(g)(1), awarded attorney's fees of $8,556.25 in addition to an itemized law firm ·disbursement billing which is the amount of the cost award of $1,178.39. The billing of account proposed exhibit detailed an individual task performance but included neither time at task nor billing rate. Actually, the record reflects that the agreement for legal services was by contingent fee of thirty-three and one-third percent through trial and forty percent upon appeal.

▉ The trial record reflects an anomaly since the billing of account statement, Exhibit 13, was rejected by the trial court when tendered for admission since the fifteen-day cutoff date for notice of exhibits had passed before its presentation. Consequently, no itemization of any kind was provided for either costs or fees. The fact that an expert witness believes that an amount on a rejected exhibit is reasonable cannot constitute proof for entitlement. Likewise, whether a one-third contingent fee is a reasonable arrangement between attorney and client cannot necessarily determine propriety of cost assessment against the opposing party. Cf. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).

The essential proof actually reveals that the trial court took an amount enumerated but not detailed in time or hourly rate from a rejected exhibit with proof by a witness that the amount would be reasonable in conjunction with a one-third contingent fee arrangement. It was the message propounded by the expert witness resulting in the trial court decision that the claimed total was "fair and reasonable compensation" since claimed only in an amount of $8,556.25, where the contingent fee payable totaled about $15,000.

This court, since *Greenough v. Prairie Dog Ranch, Inc.,* 531 P.2d 499 (Wyo.1975), has considered eleven additional cases where the method of proof of attorney's fees has been at issue.[6] This litany of cases reveals far too much investment of appellate time for a question that should be settled by proper proof and discretional decision of the trial court.

For this case, this court will adopt the well-considered principles for attorney's fee award where authorized by federal statute that the right to grant is determined by federal law, but the procedure for proof and computation of amount will be derived from the consistently applied standard of Wyoming law. *Dependahl v. Falstaff*

---

6. Including and since *Greenough,* 531 P.2d 499, direct trial court attorney's fee disputes which have been appealed have numbered twelve. This does not include divorces or worker's compensation cases where somewhat different maximizing principles may be applied, although touchstone principles for proof still apply. See *Graves v. Utah Power & Light Co.,* 713 P.2d 187 (Wyo.1986); *Lebsack v. Town of Torrington,* 698 P.2d 1141, reh'g denied 703 P.2d 338, amended 707 P.2d 1389 (Wyo.1985); *Klatt v. Klatt,* 654 P.2d 733 (Wyo.1982); *Paul v. Paul,* 616 P.2d 707 (Wyo.1980); and *Prentice v. Prentice,* 568 P.2d 883 (Wyo.1977) (McClintock, J., dissenting).

The twelve fee litigation cases include four with appellate decision that proof of reasonableness was adequate, *Jones Land and Livestock Co. v. Federal Land Bank of Omaha,* 733 P.2d 258 (Wyo.1987); *DeWitt v. Balben,* 718 P.2d 854 (Wyo.1986); *Anderson v. Meier,* 641 P.2d. 187 (Wyo.1982); and *State Sur. Co. v. Lamb Const.*

*Co.,* 625 P.2d 184 (Wyo.1981). See also *Smith v. Equitable Life Assur. Soc.,* 614 F.2d 720 (10th Cir.1980), applying Wyoming law and citing *Greenough.* In five cases, proof of attorney's fees was inadequate and the case in conjunction with summary judgment status or otherwise requiring remand was returned to the trial court to determine reasonableness of legal fees, *Meyer v. Travelers Ins. Co.,* 741 P.2d 607 (Wyo.1987); *Durdahl v. Bank of Casper,* 718 P.2d 23 (Wyo. 1986); *Shanor v. A–Pac, Ltd.,* 711 P.2d 420 (Wyo.1986); *Gifford v. Casper Neon Sign Co., Inc.,* 618 P.2d 547 (Wyo.1980); and *Greenough,* 531 P.2d 499. Finally, in the last three cases, this court found inadequate proof of amount of attorney's fees resulting in judgment reversal and denial without remand, *Albrecht v. Zwaanshoek Holding En Financiering, B.V.,* 762 P.2d 1174 (Wyo.1988); *Miles v. CEC Homes, Inc.,* 753 P.2d 1021 (Wyo.1988); and *Downing v. Stiles,* 635 P.2d 808 (Wyo.1981).

*Brewing Corp.*, 653 F.2d 1208 (8th Cir.), cert. denied 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384, cert. denied 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981). Consequently, we will again establish that standard once undertaken in *Greenough*, 531 P.2d 499 without observable success. With similar evidence of frustration, the Third Circuit Court of Appeals in 1983 addressed the subject in an ERISA case where the initial award exceeded lodestar computation:

Because this court has seen a continuing and disturbing increase in appeals from attorney's fee awards generally, we fear the guiding precepts may be misapprehended. We reaffirm the principle that the discretion to set attorney's fees is allocated to the district courts and not to the courts of appeals. Even when a district court judgment is vacated by this court and remanded for further proceedings, see, e.g., *Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 215 (3d Cir. 1983), it is the district court, and not this court, which possesses the authority to exercise fee setting discretion.

In the case at hand, legal error occurred because there was no evidence to support the increase to the lodestar amount. We may disturb the fee determination because sufficiency of evidence is a matter of law subject to plenary review, and thus our action does not amount to the substitution of our discretion for that of the district court. * * *

Nevertheless, the district court must abide by the appropriate standards and include some explanation to allow for careful appellate review. * * * We require that district courts, in applying the proper standards, set forth the specific reasons underlying the award—what the Supreme Court has described as the need to "provide a concise but clear explanation of its reasons for the fee award." *Hensley v. Eckerhart*, [461] U.S. [424] at [437], 103 S.Ct. [1933] at 1941 [76 L.Ed. 2d 40] [ (1983) ].

The principle commands more than mere ritual. From a review of the cases that have inundated this court since *Lindy I*, [*Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) ] however, we fear that many lawyers and some district judges believe that once a fee applicant has touched all the Lindy bases he or she is home free. They appear to think that it is only necessary to prepare a neat compilation of dates and hours, add a subjectively appealing percentage augmentation, and the fee will emerge in a readout of deceptive exactness—a computation untouched by human hands or the power of reason. As our disposition of the present case should make clear, this view is not correct. In all phases of the fee determination, the district judge must cast a critical eye on the award request.

*Ursic v. Bethlehem Mines*, 719 F.2d 670, 674–76 (3d Cir.1983) (footnotes omitted).

■ In universal application, the first principle of award of attorney's fees is that either authentication by contract or provision by statute is required. *Bowers Welding and Hotshot, Inc.*, 699 P.2d 299; *Alyeska Pipeline Service Co. v. Wilderness Soc.*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). This is the American rule that each party in a lawsuit ordinarily shall bear his own attorney's fees unless there is an express statutory authorization (or contractual provision) to the contrary. *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). The second standard which causes continued litigation in current Wyoming jurisprudence is that attorney's fees are a kind of punitive damage and, consequently, have to be proven to have been incurred and to be reasonable in amount to be awarded. *Greenough*, 531 P.2d 499.

■ In order to achieve some consistency and reliability among proof of factors determining reasonableness, we now specifically adopt the lodestar concept enumerated for the federal courts in *Hensley*, 461 U.S. 424, 103 S.Ct. 1933. To receive the award, the party must prevail and the fee awarded should be determined by the trial

court to be "reasonable." Justice Powell, writing that court's majority, stated:

> A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee. Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. The applicant should exercise "billing judgment" with respect to hours worked, * * * and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.
>
> We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained.

Id. at 437, 103 S.Ct. at 1941. (footnote omitted).

This is the lodestar test. See also *City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) and *Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078. Cf. *Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). Within the analysis of Justice Powell, the product of reasonable hours times a reasonable rate does not end the inquiry since the factors of discretionary application must then be considered to adjust the fee upwards or downwards.

Contest and dissent to amounts of awarded attorney's fees neither started nor ended with lodestar; just like *Greenough,* 531 P.2d 499 failed to eliminate "second major litigation" in Wyoming. The claiming litigant should first present the court with an itemized billing reflecting time and rate. Thereafter, the determination of reasonableness is within the exercised discretion of the trial court. Evidence by the claimant including an analysis by his expert witness in affidavit or testimony becomes a basic requirement since the burden of proof rests with the claimant. *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869 (2d Cir.1987).

In addition to the lodestar prerequisite as factors of discretionary application, we find the analysis in flexibility and the efficacy of *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir.1974), which is referenced with approval in *Hensley,* as appropriate to additionally answer variability justification from the arbitrary time/rate determinant. With the reasonableness of the award to be judged by the abuse of discretion standard of review, these additional factors which may be considered by the trial court include: (1) the novelty and difficulty of the questions; (2) the skill requisite to perform the legal service properly; (3) the preclusion of other employment by the attorney due to acceptance of the case; (4) the customary fee; (5) whether the fee is fixed or contingent; (6) time limitations imposed by the client or the circumstances; (7) the amount involved and the results obtained; (8) the experience, reputation, and ability of the attorney; (9) the "undesirability" of the case; (10) the nature and length of the professional relationship with the client; and (11) awards in similar cases.[7] *Johnson,* 488 F.2d at 718–19. See somewhat similarly stated in *Durdahl v. Bank of Casper,* 718

---

7. This court expressly declines incurrence into the *Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078 morass of United States Supreme Court contingent fee inquiries, since in this case, the fee requested is clearly less than that which the client will be required to pay to the attorney on their one-third contingent fee agreement. See likewise, *Blanchard,* 109 S.Ct. 939 as the converse issue of whether awarded fee can exceed agreed contingent fee.

P.2d 23 (Wyo.1986) and *Greenough,* 531 P.2d 499.

Our present inquiry does not end here since, as a matter of federal law, the trial court is given discretion to determine whether *any* attorney's fees should be awarded in this particular case. *Dependahl,* 653 F.2d 1208. We perceive that this decision of right to award is a matter of federal law as the resolution similarly applies to other disciplines where authorization is statutorily provided to supplant a federal claim and right. The Education of All Handicapped Children Act, 20 U.S.C. §§ 1400 through 1461 (1976 ed. & Supp. IV 1986), which we recently addressed on appeal in detail in *Natrona County School Dist. No. 1 v. McKnight,* 764 P.2d 1039, 1051 n. 9 (Wyo.1988), is an obvious similar example.

■ Synthesized within the federal case law are two additional principles. First, although an attorney's fee award is discretionary, it is an abuse of discretion to deny without a supported finding. *McConnell v. Meba Medical and Benefits Plan,* 778 F.2d 521 (9th Cir.1985); *Gordon v. United States Steel Corp.,* 724 F.2d 106 (10th Cir. 1983); *Hummell v. S.E. Rykoff Co.,* 634 F.2d 446 (9th Cir.1980). Second, a general five-point test has been adopted for analysis against which any finding for denial can be tested. Preliminarily, bad faith is not a criteria for fee award. *Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344 (8th Cir.1980). The five-point test is variously stated in many cases, but was initially developed by Judge Barrett in *Eaves v. Penn,* 587 F.2d 453 (10th Cir.1978) and restated in *Gordon,* 724 F.2d at 109:

> The Eaves criteria is an effective means of providing the guidance needed by district courts to exercise their discretion under section 1132(g)(1). Thus, we

hold that when determining whether to award attorney's fees under section 1132(g)(1), the district court should consider these factors among others: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to personally satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

See also, *Hummell,* 634 F.2d 446. Cf. *Bittner,* 728 F.2d 820.

Clearly, the trial court did not abuse its discretion in the fee award under this federal standard. Consequently, an award of attorney's fees is affirmed.

The final problem is what to do about unproven amounts. Recent history in this court advances no realistic or consistent result whether to deny as unproven or remand for trial court consideration upon proper proof. Since remand is required in any event to recompute the damage award, it will also include an opportunity for proper assessment of costs and attorney's fees.[8] Cf. *Miles v. CEC Homes, Inc.,* 753 P.2d 1021 (Wyo.1988).

## VIII. CONCLUSION

We affirm the judgment for the employees and remand for assessment of credit against their judgment in accord with this opinion. The judgment granting costs and attorney's fees is reversed and remanded for further trial court consideration. Employees are entitled to claim appellate at-

---

**8.** Generally, the practicing bar should be advised that proof of attorney's fees is essentially no different than proof of other elements of damage. A second chance upon remand for proof according to the appellee lacks something in litigative fairness to the opposing contestant. In this case, *we will remand since a broad and comprehensive rule is now enunciated.* For cases to be tried after the date of publication of this opinion, any similar retrial opportunity could seldom, except in the most unusual circumstances, be available. Appellate litigation for attorney's fee assessments should diminish in prevalence, or even perhaps in optimistic review, disappear. The controlling concepts are adequate proof and broad trial court discretion. To observe what will likely happen hereafter if proof to support amount is lacking, see *Key Constructors, Inc. v. H & M Gas Co.,* 537 So.2d 1318, 1325 (Miss.1989).

torney's fees since successful upon appeal in defending their entitlement to a compensatory judgment.

GOLDEN, J., filed a dissenting opinion.

GOLDEN, Justice, dissenting.

I respectfully dissent to part IV entitled, "Sufficiency of the Evidence," and part V entitled, "Limitation of Cross–Examination of Litigant Ristau," of the majority opinion.

Under the majority's sufficiency-of-the-evidence analysis in part IV of the opinion, it is said that this court considers the trial court's decision "as it analyzed the Exhibit 4 memorandum and its effect and then made evidentiary rulings on discussions from which the memorandum resulted." The majority then states that the "dispositive question is whether the trial court was required to conclude that the Exhibit 4 memorandum constituted not only a rescission of UNC Resources benefit program but also constituted a rescission of rights provided by the actual employer, UNC Teton." In UNC Teton's failure to provide any written evidence of termination of benefits and rights, other than Exhibit 4, the majority finds a factual basis for the trial court's decision that Exhibit 4 not only did not terminate UNC Teton's benefits, but also provided "evidentiary suggestion that those benefits would be continued" until UNC Teton actually rescinded them. According to the majority, Exhibit 4 was not ambiguous.

This conclusion, however, is at odds with that recognized by the majority in its part V discussion of the trial court's erroneous limitation of UNC Teton's cross-examination of Ristau. As the majority correctly notes, the trial court erroneously restricted UNC Teton's cross-examination of party Ristau to support UNC Teton's thesis that Exhibit 4 rescinded not only UNC Resources wage continuation benefits, but also UNC Teton's wage continuation benefits. This error cannot be designated as harmless. Had UNC Teton been allowed to fully cross-examine Mr. Ristau, the evidence would have shown: (1) on or about September 11 or 12, 1983, a day or two before Exhibit 4 was published, Ristau attended a meeting with Keith Cunningham II and Dan Hall in which they discussed UNC Teton's termination pay policies and then decided to discontinue termination pay practices at UNC Teton; and (2) Ristau was aware UNC Teton had discontinued all termination pay policies applicable to its employees. Appellees' objections to UNC Teton's attempted cross-examination of Mr. Ristau were erroneously sustained on the basis of the parol evidence rules. Exhibit 4 was not evidence of a contract; rather, it was evidence of a fact, i.e., that UNC Teton did not discontinue its termination pay policy. The contract itself, if it existed, was to be found in UNC Teton's personnel manual, which was only referred to in Exhibit 4. Exhibit 4, which is used as evidence of a fact rather than as evidence of a contract, may be susceptible of explanation by extrinsic circumstances or facts. *Kinser v. Elkadi*, 674 S.W.2d 226, 234 (Mo.App.1984). UNC Teton was prejudiced by the trial court's erroneous restriction of its request to cross-examine Mr. Ristau; it should have been allowed to offer evidence to contradict the appellees' contention that UNC Teton did not discontinue its termination pay policy.

I would reverse and remand for a new trial at which UNC would have full opportunity to examine Mr. Ristau.